The opinion of the Court was delivered by
Inglis, A. J.
An administrator holds his intestate’s title to all the personalty which he left at his death. He holds it, however, not in his personal right, as he holds the property which, by purchase, gift, or otherwise, he has acquired for his own use, but in an official capacity only. The title is, by the law, annexed inseparably to the office until aliened-in due course of administration. Upon the determination of a particular incumbent’s tenure, by revocation or by death, the title passes with the office to his successor, and is not, in the latter of these two events, devolved, as is the title to *292 his own property, upon his personal representatives. And, further, while his tenure endures, he holds the title not in anywise for his own use and benefit, but wholly- for the uses of the office, as the means wherewith to fulfil its duties: first, in paying the debts of the intestate, and, then, in distributing the residue as directed by the law. His estate is, therefore, according to the strictest definitipn, a special trust; he holds “ for the execution of a purpose particularly pointed out,” and “ is called upon to exert himself actively in the fulfilment of tbe settlor’s intention” — tbe law of the land, which has created his office and prescribed its duties, furnishing the definition of that intention. Lewin on Trusts, 4.
These essential attributes of an administrator’s tenure of bis intestate’s title are, in various respects, recognized and regarded even by the Courts of common law. Thus, for example, the individual, after revocation, will not be permitted to institute, or to continue, proceedings there, founded only upon the title which, as administrator, he bad held, to his intestate’s personalty; nor, after his death, will his personal representatives. Again: the property which he bolds as administrator, and that which he holds in his own right, are not equally and indifferently liable to the satisfaction of judgments at law, recovered against him individually, and in his representative capacity; but,' on the contrary, tbe judgment for tbe recovery of a debt of bis intestate, merely as such, is so framed as to restrict the levy of execution to the goods, &c., of the intestate in bis bands, and independently of any effect wrought herein by our peculiar statutes, is certainly entitled to satisfaction out of these goods, &c., at least, in preference to a prior execution for his own personal debt, (Farr et al. vs. Newman et al., 4 Term Rep. 621,) if the latter, as against creditors and distributees of the intestate, could be levied out of them at all. Whale vs. Booth, 4 Term Rep. 625, note (a); Quick vs. Stains, 1 Bos. & Pul. 293. So, also, upon the bankruptcy of the administrator, *293 these goods, &c., are not distributable, under the commission, as his property — their inclusion, specifically, in a schedule of “ his whole estate and effects,” upon an application for the benefit of the Insolvent Laws, would not be a necessary condition to his discharge; and a judgment recovered by him in his representative capacity, on a cause of action constituting part of the assets of his intestate, will not be set off against a judgment which the defendant therein holds against him in his individual capacity. Tolbert's Exors, vs. Harrison, 1 Bail. 599. But the Courts of Equity, because it is within their peculiar jurisdiction so to do, recognize to its utmost extent, and in all respects, this special character of an administrator’s tenure of his intestate’s title — enforce upon him, and all others liable thereto, the obligations thence resulting, and fully protect the interests of those for whose use alone he holds. Story Eq. Jur. § 579.
The first duty of an administrator, in the execution of his trust, as to the disposition of the assets come to his hands, is the payment of funeral and other expenses and of his intestate’s debts, and in order to this, the conversion of 'the assets into money is indispensable. In the early periods of legal history, when the administration of the intestate’s effects was a prerogative of the Crown or a privilege of the Church, and often became a largess to the favorites of either, the residue, after payment of debts, or even without such payment, was by defect of law retained by the administrator without account. Personal property then constituted but a small part of a decedent’s estate, was of comparatively little pecuniary value, often of a perishable nature, and rarely of such a kind as to make its preservation in specie important. It is not surprising that under such circumstances the conversion of the whole assets became the uniform custom, and so, ultimately, the rule. The necessities of the trust and the interest of the trustee combined to work such a result. The conversion of the assets into *294 money, by sale or collection, therefore, and even the procuring an advance of money by their mortgage or pledge, while, to the technical mind of the common law,, it was no more than an exercise of that power of disposition which is inherent in legal ownership; was also, apparently, a strict execution of the administrator’s duty, and part of a due course of administration.
When the advance of arts and commerce had greatly enlarged the comparative importance and enhanced the value of personal estates, the preservation of the assets in specie doubtless came to be of far more interest to those who had the best claim to the succession, and their right was recognized, and, gradually, more and more clearly defined and securely guarded, by successive statutory modifications of the law. Still, for the execution of the principal purpose of the trust, the conversion of the assets to the extent of such purpose was necessary, and, even when not so necessary, might, under special circumstances affecting the interests of the parties, be highly proper. The responsibility of determining beforehand the existence of such necessity or propriety was not yet imposed upon any judicial tribunal, but left still to the judgment and conscience of the administrator. As, therefore, the condition of the estate might be such as to render a conversion of the assets or of a part of them proper and even necessary — as no provision was made for ascertaining the fact of such condition by the judgment of a competent Court — as an authorized basis of action on the part of strangers, as these could have no means of information whereby they might review the administrator’s judgment in this behalf, except such as he chose to furnish them —and as his honesty and integrity were in law reasonably presumable — his conversion by sale or pledge was still regared as prima facie in a due course of administration, and in execution of the purposes of the trust. To have required, in order to the validity of his alienation, the *295 fact, instead, of the presumption, that the alienation was for the purposes of the trust, or to have exacted from every purchaser a guarantee of the administrator’s fidelity, by making the soundness of his title depend upon the subsequent application of the purchase-money, would have invested the necessary and proper alienations of administrators with heavy impediments, have greatly embarrassed them in the faithful execution of their trusts, and seriously damaged the interests of all persons beneficially concerned. It hence came to be the well-established rule, as well in equity as at law, that the administrator might “go freely to market” with his intestate’s assets, and the mere fact that they were assets and were known so to be, affected with no infirmity the title of the purchaser or mortgagee for value. Every such purchaser, &c., was justified by the law, as administered in either forum, in entertaining and proceeding upon the reasonable presumption, that the administrator was acting honestly, and was converting, and would apply, the assets for legitimate purposes.
But, as has been seen, the administrator holds the assets upon trust “for the execution of a purpose particularly pointed out” by the law which creates his office, and for this and no other end annexes to it the title of the intestate, to wit, the payment therewith of his intestate’s debts, and the distribution of the residue. The creditors and distribu-tees, therefore, while they have no specific lien which will necessarily override the title of a purchaser from the administrator who buys with notice that he is dealing with assets, undoubtedly have an equity, as against the administrator, that the assets shall be applied strictly to the purposes of the trust. And all who claim under the administrator, otherwise than bona fide and for value, take subject to this equity. If, contrary to the authorized presumption, the administrator is in fact, in any particular instance of conversion, diverting the assets from their legitimate purposes, and *296 applying them to his own use, he is, in so doing, guilty of a breach of trust, and his alienation is in fraud of the equitable rights of the creditors and distributees. He who, knowing of his intended diversion and misapplication, enables him to consummate the fraud by purchasing the assets or advancing money upon their pledge, makes himself particeps criminis; and so becomes a mala fide purchaser, &c. He takes his purchase not (as he otherwise would) discharged by the sale from, but continuing subject to, the equity o’f the creditors and distributees. He buys at his peril, and the creditors and distributees may, if their interest requires, or they choose, follow the assets in his hands and enforce upon him their equity.
They have not lost their character of assets by the alienation, and he is, quoad hoc, trustee to apply them to the purposes of the trust. So long as he knew no more than that they are assets, he might have freely bought, nor concerned himself to inquire with what intention they were sold, or to what use their proceeds were applied; for the administrator had the power of sale, and the-necessities and uses of the trust require that he shall exercise it; and when he does so, the presumption ought to be, and is, that he is in the way of his duty and selling in the execution of his trust. But the fact being contrary, and being known to the purchaser to be so, the presumption cannot have place, and his justification, which rested solely upon the presumption, ceases. If, under such circumstances, the creditors and dis-tributees of the intestate prefer to resort to the direct legal responsibility of sureties for the administrator’s fidelity in his trust, and exact of them satisfaction for the loss resulting from his breach of duty, according to familiar principles of equity jurisprudence, the sureties, have a right to be subrogated to the equity of their principal’s creditors, and to enforce it for their own indemnity. In McNeil vs. Morrow, (Rich. Eq. Cas. 172,) it was held, that where a guardian takes *297 a conveyance of property to bimself in satisfaction of a debt due to bis ward, or to bimself as guardian, and of other debts, tbe ward may treat it as so much money received, if be chooses, but be has also an equity to have satisfaction of bis debt out of the property itself; and if be elects to treat it as a receipt by bis guardian of so much money, and upon tbe .default of tbe guardian exacts payment thereof from bis surety, tbe latter is entitled to be subrogated to tbe ward’s rights against tbe guardian, and may set up for bis indemnity “'the claim which tbe ward bad from tbe receipt of tbe property in satisfaction of a debt belonging to him,” and to enforce it against tbe guardian and bis individual creditors.
In this State,, as early as 1789, tbe vastly enlarged importance of personal estates, and tbe peculiar value of tbe specific form in which, to a large extent, they existed— rendering their transmission without conversion to tbe dis-tributees, and their continuance in tbe intestate’s family, in tbe highest degree desirable — induced an attempt on tbe part of tbe General Assembly to subject tbe administrator’s power of disposition by sale to some control and restriction. A. A. 1789, sec. 19, 5 Stat. 109. Tbe regulation then devised for this end seems to have been shorn of much of its efficiency by judicial construction. Harth's Exors, vs. Heddlestone, 2 Bay, 321. In order to remedy this disappointment of tbe legislative purpose, or' from an increased sense of tbe need of tbe restraint, in 1824, in language too plain to permit misapprehension, tbe previous permission of tbe Court of Equity, or of tbe Court of Ordinary, was made indispensable to tbe validity of any sale by an administrator “ of tbe personal property.” A. A. 1824,.sec. 6, 6 Stat. 238. Tbe effect of our legislation on this subject is to take from the administrator and refer to tbe judgment of tbe Court tbe determination of tbe necessity or propriety of a sale, whether “for division, payment of debts,” or “to prevent tbe loss of perishable articles’” and tbe regulation of tbe *298 details of such sale, if ordered, “with impartial regard to the just claims of all persons interested.” The investigation into the condition of the estate and of the administrator’s accounts, which the purchaser could not make, and by the previous law, ás has been seen, was not required to make, is made for him by the Court; and until the judgment of the Court implies that this investigation has been made and has resulted in showing the necessity or propriety of the sale for the purposes of the trust, no one can acquire title by purchase from the administrator. In all cases to which this legislation is applicable, the presumption that the sale proposed by the administrator was in the due course of administration, which before sufficed for the security of the purchaser, is superseded by the positive judgment of the Court, that the sale, is advisable for the purposes of the trust. The title of a purchaser is not hereby made any more safe, nor in any respect put on a better footing than before; but the interests of those beneficially concerned are protected against the mischiefs of a presumption, reasonable in law, but often deceitful in fact, as well as of'a discretion in the manner and terms of sale that was-not likely always “to do impartial justice to all persons interested.” But purchasers are not, by any thing in this legislation, discharged from the obligation of good faith, nor is a license given to fraud. A participation by the purchaser at a sale made under such an order of Court as is here required, in a purposé of the administrator to divert and misapply the proceeds, though difficult to be conceived, yet, if actually occurring, would not be sanctified by a compliance with all the prescribed solemnities.
This legislation cannot, however, be understood as intended to apply to all the assets of an intestate. The terms used — “ personal estate,” “ personal property” — are certainly large enough to embrace every class. But choses in action, at least such as are merely securities for money due, are not *299 properly the subject of sale; their conversion is ordinarily by collection/ arid such conversion by public auction is an unusual .proceeding. Many of the reasons which may be supposed- to - have induced' this legislative restraint upon the, administrator’s power of sale are wholly-inapplicable to them, and ’• the sales contemplated by the Acts being, although not positively required, plainly assumed to be on credit, would result in a mere exchange of one chose in action for another. Yet, though the proper method of conversion in such ■ case is by collection, circumstances may exist in which a more speedy conversion, by exchange, with a third person, for the money, or even by a pledge for advances, may be important to the interests of the- administration. . The administrator’s power of disposition over his intestate’s choses in action remains unaffected by this legislation, and continues as his' power over the assets generally before the Acts has been described to have been. Any one may securely take them from him', either absolutely or conditionally, by any of the usual methods of legal or equitable transfer, for value and in good faith. He who takes them, knowing that their alienation is not for the purposes of the trust, but for the private purpose of the administrator, takes them in had faith, and is liable to account for them. When the specific goods, &c., of the intestate, come to the hands of the administrator, have been by him sold on credit, are the securities taken from them payable to himself, his own absolute property in law and equity, or are they still, in the regard of both or either of these jurisdictions, the assets of the intestate, changed in form, but subject to the same restraint upon alienation, and the same equity? Certainly, the legal relations of the administrator to such securities is not the "same as it was to the specific chattels which have been converted into them. He holds the title to these, not merely in his representative capacity, and by virtue of his office, but in his *300 personal right, and by the terms of the contract.'» In form, and in law, he is personally the creditor of the obligor in each bond, and the maker of each note. The legal title thus vested in him is not divested by a mere revocation of the Ordinary’s grant. At his death it passes not to his official successor, but to his personal representative. Actions for the recovery of the amounts secured by such bonds, &c., can be maintained at law only in his own name while living, or in that of his personal representative after his death, unless the title has been transferred by the act of the one or the other. Yet, in point of fact, these securities are but the representatives of the specific assets, which have been converted into them by the order of the law; they stand in their place. They are the materials with which the legal duties of his office are yet to be fulfilled. His fulfilment of these duties may be the subject of inquiry, under his plea of plene administravit, in a Court of law; Johnson vs. Johnson, 1 Bail. 601; or even the subject of enforcement there in an action on his bond; Ordinary vs. Hunt, 1 McMull. 382; Wiley vs. Johnsey, 6 Rich. 358. In such a proceeding, does the Court of law wholly ignore the fact of the real character of such securities — because the legal title is in the administrator personally, refuse to regard and treat them as substantially and truly the assets —and, considering the administrator as by his sale himself become the purchaser at the same or any other price, in favor of the creditors of the intestate, charge him absolutely with the proceeds ? Let it be supposed that in such a proceeding the creditor claims to charge the administrator with the aggregate amount of his sales of the intestate’s goods, &c., and thereby show a residue of assets in his hands, to satisfy the debt sought to be recovered, after a due administration of all except such residue, and the administrator proposes to prove that certain of the securities taken at his sale, just sufficient in amount to *301 cover this residue, had, without any fault on his part, become valueless, will the Court of law not entertain the excuse, and, if it be established, discharge the administrator ? And if so, how can it do this, except on the ground that these securities are in truth and substance the assets, and that for them specifically, and not for the amount of the sale-bill, as so much money received at its maturity, the administrator is bound to account, and that only according to the ordinary rule of fiduciary responsibility ? Dixon, Admr., vs. Hunter, 3 Hill, 206 ; Bryan vs. Mulligan, 2 Hill Ch. 361; Mikell vs. Mikell, 5 Rich. Eq. 225. Cr if in such a proceeding at law the creditor claims to charge the administrator with the securities taken at the sale, as principal and interest due on each has been from time collected by him, (as under- possible circumstances might be for his interest,) will it -be supposed that the Court would forbid this, and require him to abide by the sales-bill ? If in an action brought upon such a security litigation arise and expenses are incurred, will the Court of law not admit the administrator’s payment of these expenses as a fair and proper charge against the estate in his accounts ? It is quite manifest, from the opinion in Dixon, Admr., vs. Hunter, (ut supra,) that in the regard of a Court of law even the securities taken by an administrator at his sale of his intestate’s goods, &c., are really the assets changed only in form, and that for these specifically and in detail the administrator ought to be held liable; that in his annual returns and in his final account he should charge himself with the aggregate of principal and interest due and received on each of them when actually collected; and if his omission to collect them all has been prudent and consistent with his duty — as where they constitute a good investment of the funds — he may fairly bring the uncollected residue of them specifically in for distribution; and that, only when the administrator fails thus to keep and settle his accounts, *302 he may be charged with the sale-bill in gross, as the necessity of so doing is imposed upon the parties by his failure to furnish ■ them the means of more exact information. "The former method,” says the Court, "is according to the truth of the. facts.” The sale-bill is resorted to, not as the matter, but as the measure of accountability, because he who only can supply a better does not, and this, as matter of public custody, is accessible and convenient. In Tolbert, Exor., vs. Harrison, 1 Bail. 599, the judgment which the plaintiff had recovered against the defendant was on a note given by the latter to the plaintiff for purchases at a sale of the testator’s effects,.and the Court of law refused, in the exercise of its discretion, to make an order setting off against it a judgment which the defendant held against the plaintiff for his individual debt. " There can be no doubt,” says O’Neall, J., “ that technically the judgments are in the same right. The note given to the executor for a contract made with him must be treated and considered as his own. In a legal point of view it was the note of Harrison to Tolbert. It is, however, unquestionable that in fact it was a part of the assets of the estate of his testator, and the executor might and ought to have treated it as such. He on the present occasion claims that it shall be treated as assets of the estate.” It will be observed that here it was the executor himself who interposed the objection that the note on which he had recovered judgment was assets of his testator’s estate, yet it was entertained. It would seem, therefore, that the form of these securities does not conceal their real nature from the eye even of the law Court, nor prevent the conformity of its judgment thereto, in all controversies there cognizable between the administrator and those for whose use he holds the legal title.
But this is a cause on the equity side of the Court, and the pertinent inquiry, therefore, is as to how these securities are regarded and treated in that jurisdiction. . The fact that *303 the legal title is vested in the administrator personally, cannot embarrass a forum, one of whose principal functions it is to compel the legal title in one person to support and serve the beneficial interest in others, and more especially when, as is usual, the trust upon which the administrator holds the legal title, is declared on the face of the security, under the description of the official character in which the promise is made to him. In Glass vs. Baxter, (1811,) 4 Des. 153, a note was taken by an administrator, payable to himself .individually, (without any official description,) partly for assets of his-.intestate, purchased by the maker at a sale by the.administrator, and partly for goods of the administrator, personally sold to him at the same time, and included in the note as security for purchases of the intestate’s goods to the same amount bought at the sale by the administrator himself. Upon a revocation of the administration, this note was given over to the administrator de bonis non as belonging to the estate of the intestate. Upon the payee — the original administrator — leaving the State, an attachment was sued out by his private creditor, and the maker of the note garnisheed.' The attachment suit was enjoined in equity. This was a circuit decree only, not reviewed on appeal. But in Tolbert, Exor., vs. Harrison, cited above, O’Neall, J., quoted it as authority for the proposition that “the Court of equity, in the exercise of the jurisdiction which legitimately belongs to it over trustees, will follow a note of hand as the property of an estate, if really taken for assets of the estate, sold by the administrator, though the note be taken in the private name of the administrator, and will enforce this by injunction against the private creditor of the administrator.” The same Judge, in Thackhum vs. Longworth, (1835,) 2 Hill Ch. 267, says: “ It is true that the proceeds of such choses in action” (i. e. notes or bonds taken by an administrator at a sale of his intestate’s estate) “ are in equity regarded *304 as assets, and will be so treated and considered in tbe hands of tbe executor or administrator to wbom they were made payable, or any of bis immediate representatives. So, too, in all such' cases they would be protected from being made liable by process of law for tbe debts of tbe executor or administrator; and, in all cases of fraudulent alienations, tbe Court would follow and treat them as assets of the' estate;” and cites as authority, among, others, this case of Glass vs. Baxter. In Thomas vs. Gage et al., (1824,) Harp. Eq. 197, GK, indebted to tbe administrators by note for purchases at a sale of the estate, and bolding a judgment against one of them individually, gave that one a receipt for tbe amount of his judgment, and a new note for the balance of his (Gr.’s) note to tbe administrators, and took that administrator’s receipt against bis note, which was then in tbe other administrator’s bands. Gr. knew at tbe time there were outstanding debts of tbe intestate, and that the administrator with whom be dealt was in embarrassed circumstances. It was held that Gr. must account to tbe estate for tbe amount of the assets be took in payment of bis judgment against tbe administrator individually, if such administrator should be unable to pay it.
In Miller vs. Alexander, (1833,) 1 Hill Ch. 26, at a sale of A. M.’s estate by bis administrator, tbe plaintiff was a purchaser, and gave her note, with surety, payable to tbe administrator as such. Upon tbe death of tbe administrator, plaintiff took out administration de bonis non of A. M.’s estate, and possessed herself, in some way, of her own note, still unpaid. Tbe executors of tbe first administrator, to wbom plaintiff’s note was, by its terms, payable, sued at law, and recovered judgment against her on tbe note. Plaintiff thereupon brought her bill in equity, as administrator de bonis non, against tbe defendants; as executors, for an account of their testator’s administration, and to enjoin tbe collection of tbe judgment at law, on tbe ground that tbe *305 note an'd its proceeds belonged to her intestate’s estate, and that she, as the representative of that estate, was entitled to it and its proceeds. Upon the account taken, the first administrator was found indebted to bis intestate’s estate, in a balance exceeding tbe note and interest, and tbe enforcement of tbe judgment at law against tbe plaintiff on tbe note was perpetually enjoined, and sbe was required to charge herself in ber administration account with tbe amount of tbe note and interest. O’Neall, J., for tbe Court, says: "Tbe balance reported against tbe administrator was tbe money of tbe intestate still in bis bands to be administered. Upon bis death, bis legal right to retain it ceased, and upon tbe grant of administration de bonis non, it passed as tbe goods, chattels and credits of tbe deceased, unadministered by the first administrator to tbe plaintiff. This legal right to receive tbe unadministered balance of tbe money did not make ber the legal owner of tbe ■ note; that, legally, belonged to tbe administrator, to whom it was payable, and at bis death tbe right of action upon it passed to bis executors.” "This is tbe extent of tbe doctrine of Seabrook vs. Williams, 3 McC. 371. It never was intended to be said, in that case, that, because an administrator de bonis non could not sue on a note given to tbe first administrator, be would not be entitled to recover in equity any unadministered balance in tbe bands of tbe first administrator.” And tbe particular view taken is, that, in equity, tbe plaintiff would be entitled to have the decree against tbe executors of tbe first administrator, for tbe balance, set off against tbe judgment held by them, at law, against ber, on tbe note. If tbe plaintiff’s note bad been given to tbe first administrator for a consideration personal to himself, and not moving from tbe intestate’s estate, it would not have been set off. Vide Tolbert vs. Harrison, ut supra. But tbe money secured by ber note was, in equity, assets of ber intestate’s estate yet unadministered, and sbe bad a right to *306 follow and claim it as such. The defendants, instead of suing upon it at law, might have turned it over to her, as administratrix de bonis non, as assets to be by her adminis' tered, and to that extent thereby reduced the balance found due upon the account of their testator’s administration. For this was exactly what the judgment of the Court, in effect, did.
Field vs. Schieffelin, 7 Johns. Ch. 150, is a well-considered case, in which Chancellor Kent carefully examines the subject of the liability of a purchaser of a testator’s assets from his executor. Having .passed the English cases in review, he states the result thus : “ They all agree in this, that the purchaser is safe, if he is no party to any fraud in the executor, and has no Imowledge or proof that the executor intended to misapply the proceeds, or was in fact, by the very transaction, applying them to the extinguishing of his own private debt. The great difficulty has been to determine how far the purchaser dealt at his peril when he knew, from the very face of the proceeding, that the executor was applying the assets to his own private purposes, as the payment of his own debt. The later and the better doctrine is' that, in such case, he does buy at his peril, but that, if he has no such proof or knowledge, he is not bound to inquire into the state of the trust, because he has no means to support the inquiry, and he may safely rely upon the general presumption that the executor is in the due exercise of his trust.” And.he applied the rule in the case then before him to a purchase from a' guardian, but refused the relief on the ground that the evidence did not satisfy him of- the purchaser’s knowledge of the guardian’s misapplication. But the important point in this,particular connection is that the subject of alienation there was a bond, not received by the guardian originally as part of his ward’s estate, but made and payable to him as guardian for a consideration moving from himself in *307 that capacity. If, in the judgment of equity, there be any ground for a distinction in this regard between a chose in action payable to the intestate in his lifetime and come to the hands of the administrator as part of the original assets, and a security taken by an administrator for his intestate’s goods, &c., at a sale thereof, in favor of the former, is it at all likely that the trained and practised mind of that great Equity Judge would have wholly overlooked it and committed such a capital error ? But he is not singular. In Petrie vs. Clark, 11 Serg. & R. 377, the right of creditors and legatees to follow assets that have been collusively parted with is examined, and the rule is stated to be, that he only can maintain his purchase against their equity who has given a valuable consideration, and is guiltless of fraud or collusion with the executor, &e. Gibson, J., says: “In regard of a pledge, there is a decisive difference between the pawning of a security for an antecedent debt and the pawning of it for money advanced at the time. As to the first, all the cases agree, that the interest of the pawnee is defeasible by creditors; and as to the second, the validity of the contract depends on all those considerations that would affect an absolute sale under like circumstances; that is, where it appears the pawnee knew that the money was obtained for purposes foreign to the executor's duty, the transaction is to be considered collusive." “ The note on which suit is brought in this case,” says he, “was indorsed to the executors in blank for goods purchased from them, which were part of the assets, and the note itself was consequently assets in their hands. The executor, who had this note in possession, was indebted to the plaintiff on his own promissory note, to nearly the same amount, and after his note became due, made arrangements with the plaintiff by which it was taken up, and a new note, at five months, substituted; and the note on which suit is brought was handed over, with the blank indorsement of *308 the payee, as collateral security for the payment of this debt, the other executor being no party to the transaction, and the plaintiff being entirely ignorant of the circumstances under which the note in question came into the hands of the executor. On this naked statement of facts it will be seen that collusion is altogether out of the case, and that the question is, whether the plaintiff is to'be considered a holder for value. If the note had been delivered to him in discharge of the debt, there would be no difficulty in saying, in the absence of collusion, that, taking it, in the usual course of business, as an equivalent for a debt which is given up, would be a purchase of it for valuable considerations.” From all which it is manifest that he considered “choses in action acquired by the executor or administrator, with or given to him for the proceeds of the estate,” subject to precisely the same equities, of creditors, legatees and distributees, as attach upon such as belonged to the deceased in his lifetime.
Thackum vs. Longworth, 2 Hill Ch. 267, is in some respects a remarkable case. McNish was indebted to Long-worth, by his bond given in 1818, for the purchase-money of a plantation sold to him by Longworth, as executor of another. Milliken died in 1819, leaving a will of which McNish was executor, and by the provisions of which he gave a life-estate to his widow in all the residue of the proceeds of his property after payment of debts, with remainder to the plaintiff, Mrs. Thackum. In the same year McNish sold; under a power in the will, all the estate of his testator, and took from the purchasers bonds payable to himself as executor, among them Hardee’s and Cole’s bonds. In 1820 he offered the last-named bonds to Longworth in payment of his own bond of 1818, which offer was refused. Then he delivered them to Longworth, indorsed in blank, to be collected, with instructions to apply the proceeds, when received, to the payment of his bond, if it should not have *309 been previously paid. Longwortb received tbe money due on tbe bonds in January, 1823, and, in conformity with instructions repeated by McNisb when advised of the collection, entered tbe amount as a credit upon MeNish’s private bond of 1818, and took tbe receipt of tbe latter for tbe money as paid to bim thereby, wbicb receipt stated tbe money to bave been collected by Longwortb for McNisb from Hardee and Cole “ on account of the estate of Milliken.” It does not appear when tbe widow died, but tbe plaintiff entitled in remainder upon tbe widow’s death sued tbe executor, McNisb, in 1825, and, owing to bis insolvency, bad never recovered any part of her legacy. It is not stated when tbe bill against Longwortb was filed, but it came on for a bearing in January, 1833. In tbe meantime Long-wortb bad settled tbe estate of his testator, and paid over this money to tbe uses thereof. If tbe decided cases bave not been altogether wrongly read, and tbe principle of liability wholly misconceived, it cannot be doubted that, if tbe bonds of Hardee and Cole bad been original assets held by and payable to Milliken himself in bis lifetime, tbe defendant, Longworth, would have been required by tbe Appeal Court to account for them to tbe residuary legatee, as tbe Chancellor (Harper) on tbe circuit bad ordered bim to do, unless protection bad been found for bim in tbe delay of tbe parties in interest, during tbe long period of twelve or thirteen years, to question bis title to retain tbe money, and tbe fact that, lulled into security by their apparent acquiescence, be bad actually distributed tbe funds in tbe settlement of tbe estate to wbicb they belonged. He knew that tbe bonds were tbe property of tbe estate of Milliken, taken for tbe assets sold by tbe executor, held by McNish in trust for tbe purposes of that estate. He knew that, in tbe transaction between himself and McNisb, tbe latter was diverting tbe proceeds of these bonds from tbe purposes of tbe trust in applying them to bis own private use, and, by *310 accepting them, for such purpose, instead of enforcing his own remedies against his debtor, he enabled him to consummate the misapplication, confederated with him- to accomplish the breach of trust, and colluded with him to deprive of their rights, and the security for them which- the specific property of the estate gave them, those beneficially entitled. This seems to be conceded; for the reversal of the Chancellor’s decree, and the denial of the relief prayed, are rested on the distinction which the Judge, delivering the opinion, considered as existing “between alienations of the chattels or choses. in action, belonging to the deceased in his lifetime, and of such as are acquired by the executor or administrator with, or given to him for, the proceeds of the estate,” which distinction, he thought, Chancellor Kent had, in Field vs. Schieffelin, failed to advert to. Yet these remarkable words, as already quoted, are used in the opinion of the Court: “ It is true, that the proceeds of such choses in action are in equity regarded as assets, and will be so treated and considered in the hands of the administrator to whom they are made payable, or any of his immediate representatives. So, too, in all such cases, they would be protected from being made liable, by the process of -law, for the debts of the administrator, and in all cases of fraudulent alienations, the Court would follow and treat them as assets of the estate.” It would seem as if no larger concession than this could be asked or needed. Is not this applying to them in terms the same rule which fences round the original assets, “ choses in action belonging to the deceased in his lifetime ?” What is a “fraudulent alienation in” the sense of the rule ? Does it require actual dishonesty of design, craft, circumvention combined? The administrator who wastes the assets by giving them away or selling at a gross undervalue, and thereby, to that extent, endangers the purposes of his trust, is guilty, in the regard of this rule, of a fraud upon the rights of those in interest, and the donee or purchaser is a *311 party to the fraud. The purpose of the administrator, tacit or declared, to make it • up from his own means, however sincere, will not sanctify the transaction in law, or neutralize its viciousness. But the diversion of the. assets, or their proceeds, from the legitimate ends of the trust, and the application of them to the administrator’s private purposes of necessity, self-indulgence, or speculation, is no less a fraud upon those rights. And he who, with knowledge of the wrong purpose, unites with him in the consummation of such a diversion by becoming a purchaser, is a fraudulent alienee in equity, let the actual intention be ever so innocent o'f injury to the parties interested in the estate. Such seems to have been the judgment of the late Court of Appeals in Equity, in Spear vs. Spear, 9 Rich. Eq. 184, where the guardian was supposed to be using his ward’s money in his mercantile business, and was deemed therein guilty of a breach of trust. So Lord Eldon evidently thought of such “a most inequitable transaction,” as he calls it in McLeod vs. Drummond, 17 Vesey, 153. “ The Master of the Rolls truly observes,” says he, “ that there is a great difference between advancing money at the time upon securities, and taking a security in discharge of an antecedent debt; but this is, by no means, conclusive. The argument is carried nearly to this extent, that a person lending money at the time upon the deposit of the securities can hardly be supposed to mean fraud, as there is no temptation to fraud. Admitting, however, that the bankers had no other motive for the advance upon such a deposit than they generally have, if it appears in the transaction itself that the borrower is about to apply the money so raised upon the testator's property to objects with which his affairs have no connection, I should hesitate to say, that, as the temptation was so slight, the Court would not examine whether that was not a most inequitable transaction with reference to the persons entitled to that property.” So Lord Thurlow, in Scott vs. Tyler, *312 2 Dick. 712, adjudged: “But fraud and covin will vitiate any transaction, and turn it to a mere color. If one concerts with an executor, by obtaining the testator’s effects at a nominal price or fraudulent undervalue, or by applying the real value to the purchase of other subjects for his own behoof, or in extinguishing the private debt of the executor, or in any other manner contrary to the duty and office of executor, such concert will involve the seeming purchaser or pawnee, and make him liable for the full value.” And so, certainly, concluded the careful and discriminating and accurate editor of the American edition of White & Tudor's Leading Gases in Equity, when, upon a full review of the English and American cases on the subject, he thus states the result: “ Fraud will be presumed in equity, if not at law, whenever the purchaser knows, or has such notice as is equivalent to knowledge, that the property belongs to the estate, and that the executor is applying or means to apply the proceeds of sale to his own use.” 1 Lead. Cas. Eq. 92, Am. Notes to Elliot vs. Merriman.
Did not Longworth know that the bonds of Hardee and Cole belonged to Milliken’s estate ? Did he not know that, in the very transaction with him, the executor, McNish, was applying the proceeds to his own use ? If this was so, and he knew it, then it was in equity a “ fraudulent alienation,” and he was a party to it. And, according to the proposition of the opinion in respect to this very class of securities to which the bonds belonged, it would seem that they ought to have been “ followed and treated as assets of the estate.” This the Chancellor on the circuit had done, but the Court above reversed his decree. The purchaser who, having his debt well secured, had what Lord Eldon calls “so slight a temptation” to put in jeopardy the rights of the legatee, retained the fruit of his “ most inequitable transaction,” and the' plaintiff “received not one cent of her father’s estate.” The Court, in giving its judgment by *313 O’Neall, J., says: “When the goods and chattels of the deceased are sold, or his choses in action collected, the liability of the executor, or administrator, to account for the proceeds to all parties interested, is generally that to which they must look. The right to collect these proceeds is ■indispensable to the executor’s and administrator’s own safety. The right to use the fund as his own is also a necessary consequence from his liability to account. For, • after he sells he is not charged with the proceeds as he receives the money on the notes or bonds, but with the amount of the sales as cash received. Wright vs. Davis, 2 Hill L. R. 560. Upon this sum (the amount of the sale-bill) he is chargeable with interest, which shows that, in contemplation of law, he is regarded as in the use of the money. He cannot be discharged from his liability to account for the proceeds of sale but by showing that, without any fault- of his own, he has been unable to make them available. If he was not allowed to alien the notes or bonds taken for the proceeds of sale, (without any other restriction than that it should be done without fraud,) it would subject him to the consequences of general liability for the proceeds of sale, without any corresponding advantage. For, after he made a sale, and charged himself in the sale-bill with the value of the goods, yet he would stand in relation to the proceeds as if they were the goods and chattels and credits of the deceased. Such cannot be the case. If it was, the executor or administrator ought to return to the Ordinary the bonds or notes so taken by him. There is no difference, in respect to this question, between an administrator and an executor, yet, if it be true that, when an administrator transfers the bonds taken by him for the goods of the deceased in payment of his own debt, such transfer would be void, it would follow that his' sureties for the administration would, as well as creditors, legatees or distributees, have the right to follow the fund, *314 yet I apprehend that'such a consequence ought not generally to be allowed. I have already said that an alienation of the bonds or notes payable to an executor or administrator ought not to be overreached but by a superior equity or by fraud.” Is this reasoning as convincing now as it was when it conducted to the startling result of that litigation ? Have not subsequent adjudications knocked away the premises which support it ? Upon a sale by an administrator of the intestate’s assets, does the law immediately charge him with the aggregate amount of the sale-bill as so much cash then received, without reference to the actual terms of sale, whether for cash or on credit ? Is the whole estate of the intestate thereby converted into one single chose in action, to wit, the claim against the administrator for an account, and he turned into a debtor to the creditors and distribu-tees for the proceeds as cash ? Under the old law, administrators were “ accountable and chargeable for the true value ” of the intestate’s personalty come to their hands, (A. A. 1745, sec. 3, 3 Stat. 667.) According to the general rule, independently of our statutes restraining the power of disposition, the administrator sells or not at his own discretion, and in such manner, whether by private negotiation or at public outcry, and on such terms, whether of cash or credit, as he pleases. He is chargeable with the assets, and not having them to produce in specie, he is accountable for their true value, and, having taken upon himself the responsibility of converting them upon such terms as suited himself, it is not surprising that the actual sale-bill should have been frequently adopted^ by the parties calling him to account, as the standard of the true value, until it ultimately became the uniform custom, and acquired almost the force of a rule. There might have been, in that condition of things, some show of reason in charging him with the sale when made, and throwing the responsibility of collecting or making good the securities he took upon his own judgment, *315 on himself. Yet, it is supposed, such a course was never conclusive upon either party. The persons interested in 'the estate could have surcharged by showing that the true value was more, and that the sale was depressed by his want of diligence or good faith. And the administrator could have shown that he sold judiciously and in good faith, on credit, and that, without fault on his part, the security taken had proved worthless. But now, when the whole discretion has been withdrawn from him, as is done by our statutes on the subject, and his office in the sale is ministerial only — when the conversion of the assets is the act of the Court, upon its own judgment of the necessities or interests of the estate, and “the time, place, and credit to be given ” are by it regulated “ with impartial reference to the interests of all concerned,” and he is merely the agent of the Court to execute its instructions — there seems to be little propriety in charging him any otherwise than “ according to the truth of the facts,” and that is, by treating the securities, taken in conformity with the order of the Court, as the assets by substitution, and charging him with them in detail as they are in fact collected at the times and in the exact amounts, as collected. If, as part of the law regulating the accountability of an administrator, he is, irrespective of his consent or fault, chargeable with the aggregate amount of his sale, as so much cash then received, and the securities taken by him are, as in such case it would seem they ought to be, his own absolute property, upon what ground of reason can, on the one hand, any fraud in his alienation of them affect its validity, or rather, how can there be any fraud, unless it be upon his own creditors as such, or upon the alienee; or, on the other, can he make reclamation upon the estate upon his subsequent failure, from whatever cause, to collect them ? And, then, if these securities are his own absolute property, and not, in the judgment of equity, substantially the assets of the entire estate, or, if *316 it be preferred so to call them, new investments of tbe trust funds, with tbeir fiduciary character openly impressed on their face or otherwise disclosed, and so assets by substitution, the equities, which the creditors and distributees had for the protection of their interests against a fraudulent diversion of the trust property from its legitimate purposes by the administrator and his confederates, are finally gone.
The original assets are certainly, unless in particular cases of fraud or collusion already adverted to, discharged of such equities. If these equities are not transferred to„and do not attach upon, the securities into which they have been converted, then are the creditors and distributees in a worse condition than before the sale ; and, if that has been, in fact, unnecessary and really wrong, as is undoubtedly sometimes the case, the one wrong, when successfully accomplished, is made to justify all that -follow in its track. No defence whatever remains to them against the consequences of any subsequent misapplication of the proceeds of such sale, except the personal responsibility of the administrator and his bond. The next day after completing the bale of his intestate’s whole assets, he may distribute the securities taken therefor among his own creditors, or make a voluntary assignment of them, with the rest of his property, for their benefit. Upon his death they go, in the' mass of his per-, sonalty, and as part thereof, into the hands of his individual representative, and, in the event of his estate proving insufficient to satisfy all his debts and liabilities, the creditors and distributees of his intestate have no other claim upon them than for a pro rata share, in common with his private creditors. The mischiefs of such a doctrine to the parties beneficially interested in the estate of a decedent are more manifest when their interests are in the hands of an executor, without the security of a bond for fidelity. But the rule must be the same, whether the case be one of testacy *317 or intestacy. How can any or all of these results possibly be prevented, except on the ground that these securities are Btpt the absolute property of the administrator, but are held by him in trust for the purposes of his administration, and that the equity of all interested in the accomplishment of those purposes to have them applied thereto as against himself, and all claiming under him, except such as have taken them for value and in good faith, attaches upon them and will be enforced by the Court ? These securities can occupy no middle ground; they can be of no mongrel character. They are either the one thing or the other; either the legal title and the beneficial interest unite in the administrator, or else he holds the legal title in trust for the benefit of others. If the former be the case, there can be no special claim upon them acquired otherwise than can be on his property generally. If the latter, then they are in his hands, in the regard of equity, exactly as the original assets were, subject to the same restrictions upon the power of alienation and the same equity.
But what is administration ? Does the mere conversion of the specific assets into money even consummate it? Expressions implying this have been used by Judges. But is not the application of the proceeds, according to law, in payment of debts and in distribution, also essential to its completion ? Certainly the forms of oath and bond exacted of an administrator import this. If an administrator convert the whole of his intestate’s assets into money by collection and sale, and die, leaving the money so received distinguished and separated from his own in a packet indorsed so as to indicate that it is the proceeds of such conversion, would not the parcel of money so marked and identified be assets of the original intestate to pass into the hands of him who shall be deputed to administer the yet unadministered estate ? And would not equity enforce the right of such administrator de bonis non to the specific pos *318 session ? Or if, without having so distinguished it, he die, with the entire proceeds or any part thereof in his hands, having made no distribution, and leaving debts of his intestate unsatisfied, is not an administrator de bonis non entitled in equity to claim and have such proceeds from the personal representatives of his predecessor in the administration, as assets of his own intestate, to be by such administrator de bonis non administered ? Such is understood to have been the concurrent opinion of three of the Chancellors and five of the Law Judges of this State, as announced “ in the judgment of this Court ” in Villard vs. Robert, 1 Strob. Eq. 393. If, then, an administrator, under an order such as our law now requires, sells the estate of his intestate on a credit, taking bonds or notes with sureties as directed, payable to him as administrator, and so distinguished from such as are his own, and die while the period of credit is yet unexpired, will not the administrator de bonis non of the original intestate be entitled in equity to a specific delivery of such securities, (subject, of course, to a right to retain for any balance of advances or charges,) to be by himself collected and applied in a due course of administration, and to a transfer, if need be, of the legal title by the personal representatives of the deceased administrator, in order to enable him the more effectually to do this ? If so, does he not receive them as assets of his intestate yet unadministered, and how can they be such, if they were not so in the hands of the first administrator ?
If, when the account of an administrator is called for, the securities taken at a sale have been past due for a time long enough to have allowed their collection, and this has not been effected, and no sufficient cause is shown for the failure, this may be a very good reason for permitting the adverse parties, if they so choose, to charge the administrator with such as remain uncollected, and interest upon these to the time of accounting.
*319 But this is a very different thing from regarding and treating them as his absolute property from the time of the sale, and considering him by reason of such sale as become forthwith a debtor for the aggregate amount of the sale-bill. The same course may be and has been pursued in reference to choses in action held by the intestate in his lifetime, and come to the hands of the administrator as part of the original assets, when he could have collected them, and neglected to do so. In Wright vs. Davis, 2 Hill, 560, referred to in the opinion in Thackum vs. Longworth, it is said, “the whole amount of the sale-bill is properly chargeable to the administrator as so much money received on the day when due." But if the bonds, &c., taken at the sale be his absolute property, the proper time for charging him must be the day of the sale, for he has then appropriated the assets. There is no more reason for waiting until the maturity of the securities, or, at least, the expiration of the time limited by the order of sale, than there is for waiting until he has had time enough, in the usual course of lega! proceedings, to collect them. According to all the probabilities which result from actual experience, the latter is far the more reasonable, if reference is intended to be had to the likelihood that he has in fact received the money due on them. And if he has had a sufficient and satisfactory reason, with reference to the interests of the parties, for forbearing to collect them, though time has sufficed, it is quite as reasonable as either not to charge him with them until his final accounting, and not then unless with his consent. But if this practice of charging the administrator with the sale-bill has been resorted to, as a method of approximating the “truth of things,” when the administrator himself either cannot, from his defective mode of keeping his accounts, or will not, give the necessary information of that truth, then it is not difficult to see why the date of the maturity of the *320 bonds, &c., bas been chosen as the time for making the charge.'
But Thackum vs. Longworth was decided in March, 1835, and the points made in the extract from the opinion which has been here introduced were brought again under review before a Court composed of Chancellors and Law Judges sitting together in December, 1836, in Dixon, Admr., vs. Hunter, 3 Hill, 204, already cited. Upon that occasion conclusions were reached, and are stated in the judgment of the Court, wholly different from the propositions on the same points in Thackum vs. Longworth, and entirely in accordance with the views which have been here urged, so far as these are applicable thereto. “ But,” says Evans, J., as the organ of the Court, “ there is another question growing out of this case. The Ordinary, adopting the rule laid down in Davis vs. Wright, charged the administrator with the gross amount of the sale-bill at the-time it became due, and this, with the other items of receipts for the current year, deducting the payments, constituted the balance on the 1st January, 1835. In the case of Davis vs. Wright, this mode of settling executors’ accounts is adopted, as calculated to do justice in the great majority of cases. I subscribe most cheerfully to the general'reasoning of that well-considered opinion, but it seems to me that the same desire to simplify, and thus render intelligible and practicable, the rules to be observed in settling trustees’ accounts, bas led to the same error as in Jones vs. West, 2 Hill, 560. The error is in substituting a rule for a principle. The rule is inflexible, but the principle adapts itself to the infinite variety of the affairs of men. Can any good reason be assigned if an executor suffer the sale-bill to remain at interest, collecting so- much as is necessary to meet the exigencies of the estate, rendering regular accounts of his transactions, showing when he collected the funds of the estate, and how and when he disposed .of them, why his *321 accounts should not be settled according to the truth of the facts, rather than by reference to any artificial rule ?
“ The position here stated is illustrated by the case under consideration. The administrator appears to have rendered annually, accounts, (the correctness of which was not impeached,) of his transactions in relation to the estate. When he collected debts he charged himself with them, and when he paid a debt he entered it as a credit. The notes and debts uncollected, with interest due thereon, he offered to, bring into the'final settlement, and thus account for all the trust funds which had come into his hands.
“ This, it seems to me, was acting in good faith, and was doing in relation to the estate, exactly what a prudent man would do in relation to his own affairs. All that could be asked of him was, that he should show satisfactorily how he had disposed of the funds, and that he had not suffered them to be unnecessarily unproductive. If he had not made interest when he might have done so, he should be charged with the interest thus lost, and if it was necessary to keep the fund on hand to meet the debts or necessary ex- / penses, then he ought not to be charged with interest. But, it is supposed, there is no difference between this mode of settling the accounts and that mode which charges the amount of the sale-bill in gross. This is not so. By this latter mode, interest is charged as if he had collected the whole sale-bill on the first of January, after it became due, and put it out to interest on that day, and the accruing interest is brought into the account at the beginning of each year, as if the executor had collected it precisely on the day it was due, which is requiring more than can be done by any man in relation to his own private affairs, and this is all that is expected or required of an executor. I am not to be understood as meaning to say, that every trustee' is entitled to have his accounts so adjusted. If he acts fairly, if he renders his accounts according to law to the *322 Ordinary, and exhibits by his returns a full and satisfactory account of his transactions in relation to his trust, then his accounts are to be adjusted in the way herein directed. But if, as is too often the case, he renders no accounts, or such as he renders are irregular or imperfect, then the general rule, as in Davis vs. Wright, and adopted by the Ordinary in this case, ought to be applied, of charging him with the gross amount of the sale-bill, and computing interest on the principal of annual balances, as herein set forth. Of this, if it works injustice, and subjects him to a greater amount of interest than he has made, he cannot complain. It is the effect of his own conduct, and of his neglect of the duties imposed on him by law, and the office which he has undertaken to execute. The office of an executor is one of great trust and importance, and every inducement should be held out to the honest and faithful discharge of its duties, and no favor should be shown to one who looks to his own gains rather than to the interest of his cestui que trust''
In Bartlet and wife vs. Lewis et al., heard at Sumter, June, 1860, the precise question, now under discussion, as to the correct mode of stating the accounts of administrators, &c., in this particular, was .made by exceptions to the Master’s report, which had adopted and recommended the mode of statement which is here maintained. The Chancellor, who heard the cause, overruled the exceptions and confirmed the report in this particular. " There can be no difficulty,” he says, “ on the part of an administrator, or other trustee, in so keeping a record of his receipts and payments as to enable a competent accountant readily to make up an account current of the whole administration of his trust. A receipt of money is a single fact, as is a payment. It is only necessary to .record the date, amount, the person to or from whom, and on what account. The only strictly proper method of stating such an account is to charge each receipt of payment *323 according to the truth — that is, the amount, and at the date at which it was actually made. All other methods, such as charging the sale-bill in gross, &e., are but occasional substitutes for this, recommended in particular instances, by considerations of convenience, or rendered necessary by the failure of the accounting parties to furnish the information requisite for the better method. The Commissioner, in conformity to the truth of things, as evidenced by the returns and vouchers produced by the administrator himself, charging not the sale-bill in gross at its maturity, but the proceeds of sales at the various times, and in the amounts as actually received, has stated the administration account upon correct principles.” An appeal was taken, assigning error in the decree^ in this and other particulars touching the statement of the accounts. It is stated at the bar, on , the present occasion, and not denied or doubted, that the decree was affirmed. Rut the records of the Court of Appeals, of that date, have been destroyed.
The judgment in Thackum v. Longworth is understood to rest entirely upon the supposed distinction between choses in action which belonged to the intestate in his lifetime, and have come to the hands of the administrator as part of the ' original assets, and bonds, notes, &c., taken by the administrator, payable to himself, at a sale by him of the goods, &c., of his intestate. And this distinction is(, in its turn, there rested on the proposition, that, upon a sale by the administrator of his intestate’s goods, &c., the law charges him with the amount of the sale-bill in gross at its maturity, as so much money then received, and not with the securities taken by him as assets in a converted form yet to be administered. The securities, it is therefore argued, must be his own property, or, at the least, subject, much more than the original assets, to his power of disposition and alienation. And as the judgment in that case cannot stand with that to which this Court has come upon the present occasion, it has *324 been considered proper to discuss, even thus extensively, tbe propositions which thus seem to constitute its foundations.
It bas been seen that, upon an offer by an administrator .to sell or pledge the cboses in action belonging to bis intestate’s estate, tbe party witb whom be proposes to deal bas tbe right to presume, in tbe absence of knowledge to tbe contrary, that tbe proposed alienation is for the purposes and in tbe due course of tbe administration. This presumption is founded, as bas been stated, upon tbe nature of tbe trust and its consequent exigencies, and tbe impracticability of any successful investigation by third persons into tbe actual state of those exigencies. Representations of the administrator, concurring with this presumption, cannot add to its legal force, or constitute any independent security to tbe purchaser, &c., in bis dealings. If tbe presumption were not fairly authorized by tbe nature of tbe case, and affirmed by tbe law, no such representations could, in themselves, constitute a protection to tbe purchaser, &c., against tbe equities of tbe parties in beneficial interest.
If tbe law could have regarded it as reasonable to aU tribute such effects to representations of this kind, there would have been no need of tbe presumption, and tbe rule could never have grown up. Let it be supposed that, instead of such presumption, there bad been exacted by tbe law from every purchaser, &c., a diligent bona fide inquiry into tbe condition and necessities of the estate, with a view to ascertain whether tbe proposed alienation was required by its present wants. Would taking tbe mere representations and statements of tbe administrator satisfy such an exaction ? Jealousy and doubt of tbe administrator would be tbe only foundation of such an exaction, and these could, of course, not be thus satisfied. For be who would violate bis trust and deal dishonestly or unfairly witb those for whose use be bolds tbe property, would not *325 hesitate to make the representations necessary to the success of his inequitable purpose. The impracticability of such inquiry — because, to make it of any value, it must be pursued through independent sources of information — is the very ground of the legal sufficiency of the presumption which takes its place. The security of the purchaser is therefore precisely the same, ■ whether the administrator speak or be silent.
When it has once become known to the persons, to whom the offer of sale or pledge is made, that-the immediate purpose of the administrator therein is to apply the money, to be paid or advanced, to his own private use, whether in payment of his individual debt, or otherwise for his personal necessity or profit, the burden of the peril is, eo instante, shifted. Up to this point the law imposed the risk of the administrator’s fidelity upon the parties interested in the estate. But it is now, prima facie, ascertained that he is proposing a breach of his trust, and, if there be any facts in the condition of the estate which can rebut this prima facie, the purchaser must take the onus of showing it. He assumes this risk. There is no presumption authorized by law, arising at any point of time, that the administrator is in advance for the estate, and, therefore, entitled to appropriate to his own use the assets for his reimbursement. Some expressions, apparently to this effect, may be found in the language of a' few judicial opinions, but they are, in every instance, where observed, incidentally introduced, and do not represent any deliberate judgment upon a point made. No case has been found affirming such presumption as matter of law. If any such further presumption as this were adopted by the law, the last guard of the rights of the creditors and distributees, against the misdealing of the administrator, apart from his personal responsibility, would be almost wholly gone. Only in the most narrowly restricted class of exceptional cases would any responsibility, *326 on the part of the purchasers, &c., dealing with the administrator, remain. But there is no foundation, in the nature of things, for such a presumption. It would do violence to probability. A sale is, prima facie, a necessity for the purposes of the trust, and may be a duty for the interests of the parties beneficially concerned. There is, therefore, a probability that, when proposed, it is for the execution of the trust, and hence the presumption which the law recognizes and supports. But an advance, by the administrator, of his own money, is neither a necessity nor a duty.
Time is given him to ascertain and provide means for paying the debts. Nor is such an advance according to the ordinary course of human conduct in business affairs. But if a party, uniting with an administrator in a prima facie misapplication of the assets, can lean for his justification on no such presumption of law, still less can he find exemption from liability in any representations of the administrator as to the state of his accounts. He who permits himself to be seduced by the representations of a trustee, to engage with and aid him in what is, prima facie, a breach of his trust, must bear the risk of the trustee’s truthfulness and accuracy. If the representations to which he listened turn out to be false, the consequences of his credulity ought to fall on himself who trusted them, and not to be thrown on those whose rights are independent of the trustee’s title and not derived through him.
The credulity which accepts representations, aud even written exhibitions, of the state of an account, as a foundation for confidence in venturing upon dealings otherwise of doubtful propriety, is the less excusable at this day when the world has grown familiar with the facility wherewith adepts in the science of accounts can successfully cover up, under the magic of formal entries, the misappropriations of years, until, by the mere weight of their accumulations, they burst the bonds of concealment. The present state of *327 society furnishes a weighty admonition against any relaxation of the obligations of fiduciary responsibility, and a motive to strictness in the application of existing principles on this subject to conditions not heretofore expressly provided for by positive adjudications. And although this Court does not undertake the office of a reformer, it is eminently proper that all judicial tribunals should, in the exercise of their appropriate functions, exert a conservative, if possible, an elevating, influence upon the tone of public sentiment, the more effective because silent and incidental. A foreign essayist of the day, referring to the present moral tone of society, says: “ The increase of dishonesty in all classes is appalling. This is true ,not only in the great banking system and in the railway companies, but among tradesmen and shopkeepers, with whom cheating is beginning to be the rule, and honesty the exception.
“ The crime of society may be a scar upon its surface, but its commercial corruption is the rottenness of the bones. The fact that the offenders are not of the criminal class, not outcast wretches, born of races of thieves, but wealthy speculators, living in splendor, rich tradesmen, keeping up all the outward show of respectability, subscribing to charities and attending churches — this fact is what makes the matter so terrible.” Happily for us, this is, as yet, no true picture of our society. But it may not be forgotten that most powerfully conservative elements are now disappearing, active principles of corruption are being imported and infused, and the process of disorganization is advancing with constantly accelerating speed. “It has become a crying evil in our times,” says the late Ch. Wardlaw, in Spear vs. Spear, 9 Rich. Eq. 184, “ that persons seek trusts, especially administration and guardianship, not for the good of those beneficially interested, but for the accommodation of themselves and their sureties and other especial friends. This is in flagrant violation of the rules and doc *328 trines of equity concerning trusts.” The true and proper policy of the Courts, in reference as well to the highest moral interests of society as to the material interests of the vast number of merely beneficial owners of property, whose protection constitutes so large a branch of equity jurisdiction, requires that, in moulding the system of doctrines which there obtained in respect to the rights and duties ,of fiduciary relations, any encouragement which the prospect of legal impunity gives to unfaithfulness or dishonesty shall be reduced to the lowest practicable limit, and that the powers of those who have the rights and interests of such merely beneficial owners in their keeping shall be subjected to as strict restraints as can consist with the efficiency of such keeping.
In relation to the particular subject now under consideration, the insolvency of the administrator at the time of. the dealing which is called in question in any case, seems to be important only in two points of view. It has been stated that he who would maintain his purchase of the assets from the administrator, must have given a valuable consideration, as well as bought bond fide. If the administrator is in fact insolvent, and his creditor takes from him assets of his intestate, in satisfaction of a debt which he could not otherwise collect, or could only in part collect, then he does not give value in exchange for the assets, and shall not keep them, even though he does not know them to be assets. And when, under such circumstances, the purchaser, mortgagor, &c., does know them to be assets, whether taken in satisfaction of a private debt of the administrator, or for full value* in money paid at the time, to be used within the knowledge of such purchaser for the administrator’s private purposes, this insolvency, if known to him, constitutes an aggravation of his malafides, because it enhances the peril in which he puts the interests of the beneficiaries; but is not of its essence, for that consists in *329 his knowledge of the intended misapplication and his cooperation in the administrator’s breach of trust.
The nature of an administrator’s title or estate in the assets, as recognized both at law and in equity in its present shape, to which it has been gradually moulded by the process of statutory modifications of the common law; the rights and equities of those for whose benefit it is vested in him, against himself and strangers dealing with him, and, through such beneficiaries, of those who are pledged to them for his fidelity; the origin and reason of the large power of disposition which the early law gave him; the gradually but steadily ■ tightening restriction thereupon, which the progress of society, as affecting the reasons therefor, has produced, and the present exact definition of this power; the consequences, in the present state of the law, of a conversion of the specific assets by sale under competent authority, to this official responsibility; the relations of the administrator to and his power over the securities taken at such sale, if on credit; the grounds and the exact limit of the presumption which the law authorizes as to the purposes of his alienation, for the protection of those to whom he aliens; and the relations of the whole subject to a sound social morality, have been thus patiently, doubtless to readers tediously, passed under examination, with a view to bring out distinctly the precise rule of the liability of strangers dealing with the administrator for the assets in his hands, even though it be in their converted form after gale. The examination and discussion are supposed to have established the following propositions:
1. No valid alienation of an intestate’s personal chattels or visible effects can be made by an administrator without a previous order of the Court of Equity or of Ordinary.
2. A valid alienation, by way either of sale or pledge, of the choses in action belonging to the intestate’s estate, may be made by the administrator, of his own motion, to *330 any one who takes them, bond fide and for full value, not grossly inadequate, and upon such alienation they will be discharged of all equities which attach upon them merely as assets.
3. An appropriation by an -administrator of the assets of his intestate to his own private use is, prima facie, a breach of trust, and a fraud upon the rights of those interested in the estate; and he who, knowing the purpose of the administrator so to appropriate them, purchases them from him, or advances him money upon their pledge, whereby the fraud is actually consummated, takes them mala fide.
4. The securities taken by an administrator at a sale by him of the intestate’s estate, for the assets sold, payable to himself, are, equally with the choses in action which the intestate held at his death, under the protection of this ■ restriction on his power of alienation.
5. The' creditors and distributees of the intestate have an equity as against the administrator, that the assets shall -be applied exclusively to the purposes of the administration, which, in the Court of Equity, will be specifically enforced, when necessary, for their protection, and this equity follows the assets or their value into the hands of any -one who takes them from the administrator mala fide, or without valuable consideration.
6. The surety of an administrator who has been com-: pelled to answer to the creditors and distributees or either for the default of the administrator, resulting from his misapplication of the assets, is entitled to be subrogated to this .equity, and have it enforced for his indemnity against one who has knowingly contributed to the default by taking from the administrator the assets mala fide, or without value.
7. When once it appears that the purchaser, &c., knew that the administrator was applying the assets to his own *331 use, he is prima facie concurring in a breach of his trust and a fraud upon the creditors and distributees, and if there is any thing in the facts which justifies such a use of the assets, the burden is on such purchaser, &c., to show it. He takes the risk of the truth of any representations, made by the administrator, of the existence of such facts, and if those representations prove false, he must bear the consequences.
The facts of the case before the Court which has occasioned this discussion, so far as necessary to be stated, in order to show the application of these principles to its disposition, may be thus summed up. Under an order of the Ordinary, the personal estate of Leonard White was on 26th December sold by the administrator, William Lewis, one of the present defendants, on a credit of twelve months, and notes under seal, payable “ to William Lewis, administrator of the estate of Leonard White,” were taken from the purchasers. Among the securities so taken, were the three sealed notes of Thomas M. Dick and others, mentioned in the pleadings, amounting in the aggregate to a principal sum of $10,275, on which interest ran from the day of sale. In December, 1858, Lewis, desiring to purchase at certain estate-sales of negro slaves, which were to be made on credit, for bonds or notes with surety, in the beginning of the following year, applied to his present co-defendant, John R. Pollard, to become his surety on his bonds or notes to be given for such purchases as he would then make, and promised to transfer to or deposit with him, for his indemnity against loss by reason of such suretyship, these notes' of Thomas M. Dick and others which he held as administrator. Pollard consenting to this arrangement, Lewis made sundry purchases of slaves, and executed these several securities to different persons, with Pollard as his surety on each, amounting in the whole to $11,635, and, in fulfilment of his promise, delivered the three notes of Dick to Pollard, *332 for which the latter gave him a receipt, acknowledging that they were to he applied, when collected, to these bonds and notes on which Pollard had thus become Lewis’ surety. "Various payments were thereafter made to Pollard or to his use on these notes, until, at November Term, 1860, of the Court of Common Pleas, the aggregate of principal and interest remaining due on them had been reduced to $3,944.82, for which sum judgment was rendered at that term, on said notes in favor of Wm. Lewis nominally, (but really intended for the use of Pollard,) and shortly afterward the sum of $1,134.78, part of said recovery; was paid to Pollard. In October, 1860, a decree was rendered in a cause which had been long pending in the Court of Equity, for the settlement of the administration account of Lewis, and a distribution of the residue of the estate of his intestate, Leonard "White, which decree found a balance of $14,353.15 to be due by Lewis on his accounts to the distributees, besides some $1,733.04 to judgment creditors of the estate. This balance continuing unpaid, suit was soon after instituted on Lewis’ administration bond against the present plaintiff, Levi F. Rhame, as surety. Rhame subsequently paid of the recovery against his principal, Lewis, in divers sums at various times, the aggregate sum, in all, of $14,372.13. Pending the suit against him on the administration bond, he brought his present bill to set up and enforce, for his indemnity pro tanto, the equity of the creditors and dis-tributees whom he was bound to pay against William Lewis, his principal, and John R. Pollard, as the alienee of Lewis, to have the Dick notes, which had been so transferred to Pollard, applied as assets of the estate of White for his relief to the satisfaction of the recovery of the distributees and creditors of White against Lewis on his administration' account, or to the reimbursement of what he, (Rhame,) as surety, was liable to pay, and has now paid thereon.
At the time of the arrangement between Lewis and Pol *333 lard, in pursuance of -which the Dick notes were transferred to, or deposited in pledge with the latter, Lewis told Pollard that he was in urgent want of the money, and had failed in his efforts to raise it, and that his purpose in purchasing the negroes was to supply this need by re-selling in the West for cash. The brief does not inform the Court (and the counsel on neither side was able at the argument to supply the omission) whether any such resale was ever made or attempted, or whether the negroes then purchased did not remain in Lewis’ possession until emancipation set them at' large. At the same time, Lewis also represented to Pollard that “ he had made such large payments to the distributees of Leonard White out of his own funds, that, when the estate was wound up, the distributees would fall in debt to himin order to convince him that the Dick “notes were his own, property,” he exhibited a written statement of his administration account to Pollard, and told him that " he had shown his accounts to some of the distribu-tees, and they were satisfied with his statement and showing.” As his account was afterwards made up,.it appeared that, from the end of the first year of his administration, (1853,) there had always been a balance against him, of never less than $3,000, and generally from $7,000 to $8,000 ; that, at the time of these representations, (January, 1859,) there was due by him, to the estate of his intestate, over $18,000, and that, having begun the preceding year (1858) with a balance against him, on the 1st January, of $6,340.33, he had paid out during that year only $6,297.48, and had received $18,252.17.
Even if, as is probable, the Dick notes are in the account charged against him in the receipts of that year, and help to make this large aggregate, there was, over and above them, at the time of his statement to Pollard, a balance of about $7,000 of the estate’s money in his hands.
And in a little more than a year afterwards, when his *334 final account was made up in tbe Court, be was found to owe a balance of over $16,000, including outstanding judgments.
In tbe interval between his representations to Pollard and his final accounting, bis aggregate payments on account of bis administration were only a little over $3,000, being less than half tbe balance then in bis bands, even if tbe Dick notes bad not been charged to him, but bad been retained for, and as part of, tbe unadministered assets for distribution.
From 1847 to 1861 there were entered, in tbe office of tbe Clerk of tbe Common Pleas for Sumter, 129 judgments against William Lewis, and during Frierson’s sheriffalty, .(from 1856 to I860,) there were in bis office " a great number of executions, against Lewis, of large amount.” In January, 1859, tbe date of tbe transfer to Pollard, there were open and unsatisfied executions against him to tbe amount, in tbe aggregate, of $23,000, including one for tbe enforcement of a judgment by confession to one Norton for $8,280, with interest payable annually from May 20, 1854, which was also further secured by a mortgage of tbe land for tbe purchase of which tbe debt was contracted. Just before tbe transfer to Pollard, Lewis mortgaged to one Crane a tract of six hundred acres of land and twenty-one negroes —“ constituting the whole Lewis was supposed to own not already under mortgage.”
The other negroes be bad in bis possession belonged to bis wife and children. It thus appears, that all bis visible property was at this time under mortgage, and there were besides unsatisfied judgments to a large amount against him — and most, if not all, of this must have been matter of public record. He told Pollard “ be desired to raise money, but that he could not borrow it out of the banles, and had tried private individuals and could not get it.” He testifies that, “when be gave bond to Crane,” (January, 1859,) “be could *335 have given bond for $50,000 and given one hundred of best men as his sureties. Pollard was his surety on one of his official bonds.” On that occasion, so far as appears, and as indeed seems implied, although his official bond must have been for a large amount, no indemnity, or counter security was exacted. But extraordinary efforts and urgent representations and offers of indemnity are in fact deemed by him necessary, at the very time of his arrangements with Crane, to induce one (of the “ one hundred ”) to become his surety for $12,000 — and Pollard, advertised of the extraordinary straits he is in for want of money, and the unusual and hazardous shifts to which he is about to resort to raise it, thinks it important to be secured against so comparatively small a liability.
It is quite manifest, from this statement, that the Dick notes were the property of the estate of Leonard White— assets in a converted form; that Pollard, at the time of their pledge to him, knew this, because it appeared on the face of the notes and was avowed, or necessarily implied, in the painstaking statements of Lewis; that Lewis, in the transfer of them, was in fact applying them to his private uses, and Pollard knew that he was so doing; for whether it be considered that they were employed in the purchase of slaves, this was plainly no part of the administration of Leonard White’s estate, and so could not be in execution of his trust, but, on the contrary, was for an “ object with which the intestate’s affairs had no connection;” or, Lewis’ declaration of his purpose in buying the negroes be accepted, he made it certain he was raising the money for his own private purposes, exclusively, by his zealous and careful effort to convince Pollard of his right to use the notes, which use would have needed no such labored justification as he tendered, if the money, to be thereby raised, was intended to be employed for any legitimate purpose of his trust.
*336 The use made by the defendant, William Lewis, of the three notes of Thos. M. Dick and Eobert J. Dick, mentioned in the pleadings, was a clear breach of his trust as administrator of the estate of Leonard White, and his co-defendant, John E. Pollard, knowing of his purpose so to misapply them, and aiding him in its consummation by taking the notes from him, acquired his possession of them, and of their proceeds since, so far as collected, mala fide. Had they been retained and applied, as they ought to have been in a due course of administration, the balance due by Lewis on his administration account would have been greatly less than it was found to be, and indeed comparatively trifling, and the liability of the plaintiff, as his surety, would have been correspondingly reduced. The large increase, thus resulting from this breach of trust, of Lewis’ indebtedness to the distributees and creditors, for his default in payment of which the present plaintiff, Levi F. Ehame, has been or will be compelled to answer, is a damage against which he is entitled to be indemnified by recalling the misappropriated assets or their proceeds from those who wrongfully ■possessed themselves of them, and this is the relief he asks. This Court is of opinion that the Chancellor below erred in dismissing the plaintiff’s bill, and that his decree to this effect ought to be reversed, and so it is ordered and adjudged.
It is further ordered and decreed, that the defendants, William Lewis and John E. Pollard, their agents, attorneys, and servants, and each of them, and the agents, attorneys, and servants of each, be, and hereby are, perpetually enjoined from collecting or receiving, by themselves or himself, or any other, for their or his use, any part of the balance remaining due on the judgments recovered in the Common Pleas, in the name of the said William Lewis, against William Edward Dick, as administrator of the estate of Thos. M. Dick, and against Eobt. J. Dick, severally, *337 on the said three sealed notes (¡or any of them) of Thos. M. Dick and Robt. J. Dick, mentioned in the pleadings; and the said Robt. J. Dick and ¥m. Ed. Dick, administrator, be in like manner enjoined from in anywise paying the same, or any part thereof, to the said ¥m. Lewis, or Jno. R. Pollard, or any one for the use of them or either of them; that the said balance remaining due on the said judgments be paid into the hands of the Commissioner of the Court of Equity for Sumter District by the said Robt. J. Dick and ¥m. Ed. Dick, administrator, and the officers or officer who shall collect the same; that the said Commissioner take an account of all moneys received by the defendant, John R. Pollard, in part payment of the said three sealed notes of Thos. M. Dick and Robt. J. Dick, mentioned in the pleadings, after their transfer to or deposit with him in January, 1859, or of the judgment recovered on the same, the times when received, and the currency in which, with interest on each sum so received from the date of its receipt, and the present value, in lawful money of the United States, of any of the said sums that were received, if any, in Confederate treasury notes, having respect, in estimating such value, to the provisions of the Ordinance of the Convention of September, 1865 — “To declare in force the constitution and laws heretofore in force in this State,” &e., in the first proviso in the fourth section thereof; that the said defendant, John R. Pollard, pay into the hands of the Commissioner aforesaid the aggregate sum of principal and interest which shall be so found to have been received by him. when the same shall be finally ascertained by the confirmation of the Commissioner’s report; that the said Commissioner also take an account of the payments heretofore made, or that shall be made, by the plaintiff, Levi E. Rhame, by reason of his liability, as surety, for the said William Lewis’ administration of Leonard White’s estate, the particular circum- . stances under which, the times when, and the currency in *338 which the said payments were made, and the present value, in lawful money of the United States, of any said payments that were made, if any, in Confederate treasury notes, respect being had to the provisions aforesaid of the Ordinance of the Convention of September, I860, and also of any still outstanding liabilities of the said estate of Leonard White, or of the said William Lewis, as administrator thereof, to creditors or distributees; that out of the funds, to be so paid into the hands of the said Commissioner, from the several sources herein mentioned, he pay, first, all such liabilities, of the said estate of Leonard White, to creditors or distributees, as shall be so found still outstanding, and, then, such amount as shall be found upon the account herein ordered, when finally adjusted, to be due to the plaintiff, Levi F. Rhame, for the payments, with interest on each from its date, that have been made or shall be made by him by reason of his liability, aforesaid, as surety for the said William Lewis’ administration of the estate of Leonard White, and then the surplus, if any, to the defendant, John R. Pollard.
Wardlaw, A. J., Munro and Dawkins, J. J., and Le-sesne and Johnson, C. 0., concurred.
Dunkin, Oh. J., Glover, J., and Carroll, C., dissented.
Moses, J., having been of counsel, did not sit.

Decree reversed.