# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Thayer W. Arredondo, as Personal Representative of the Estate of Hubert Whaley, deceased, Petitioner,

v.

SNH SE Ashley River Tenant, LLC; FVE Managers, Inc.; Five Star Quality Care, Inc.; SNH SE Tenant TRS, Inc.; Senior Housing Properties Trust; SNH TRS, Inc.; Candy D. Cure; John Doe; Jane Doe; Richard Roe Corporation; and Mary Doe Corporation, Defendants,

Of which SNH SE Ashley River Tenant, LLC; FVE Managers, Inc.; Five Star Quality Care, Inc.; SNH SE Tenant TRS, Inc.; Senior Housing Properties Trust; SNH TRS, Inc.; and Candy D. Cure are the Respondents.

Appellate Case No. 2019-001767

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Charleston County
J. C. Nicholson Jr., Circuit Court Judge

---

Opinion No. 28011
Heard November 19, 2020 – Filed March 10, 2021

---

## REVERSED

---

Kenneth Luke Connor, Christopher Caleb Connor and Laura S. Jordan, all of Connor & Connor, LLC, of Aiken, for Petitioner.

G. Mark Phillips and Robert William Whelan, of Nelson Mullins Riley & Scarborough, LLP, of Charleston, for Respondents.

---

**JUSTICE JAMES:**    This appeal concerns the enforceability of an arbitration agreement executed between Ashley River Plantation, an assisted-living facility (the facility), and Thayer Arredondo, the attorney-in-fact under two powers of attorney executed by Hubert Whaley, a facility resident.  In an unpublished opinion, the court of appeals held the arbitration agreement was enforceable.  *Arredondo v. SNH SE Ashley River Tenant, LLC*, Op. No. 2019-UP-293 (S.C. Ct. App. filed Aug. 14, 2019).  We hold neither power of attorney gave Arredondo the authority to sign the arbitration agreement.  Therefore, we reverse the court of appeals.

## I. Background

On October 12, 2012, Arredondo decided to place Mr. Whaley, her father, in Respondents' Ashley River Plantation assisted-living facility in Charleston.  Whaley was eighty-four years old, was diagnosed with dementia, and required assistance with daily functions such as bathing, dressing, toileting, and taking medications.  When Whaley was admitted into the facility, Arredondo held two valid powers of attorney, a General Durable Power of Attorney (GDPOA) and a Health Care Power of Attorney (HCPOA).

When Arredondo and Whaley arrived at the facility, Arredondo met with a facility representative and signed various documents in connection with Whaley's admission.  During that meeting, the facility representative did not mention or present an arbitration agreement to Arredondo.  Later that day, after Whaley was admitted, Arredondo met with a different facility representative who, according to Arredondo, told her she "needed to sign additional documents related to [her] father's admission to the facility."  Included among those documents was the arbitration agreement, which Arredondo signed.

The arbitration agreement, which Arredondo obviously executed before any dispute arose between the parties, contains a mutual waiver of the right to a trial by

judge or jury and requires arbitration of all claims involving potential damages exceeding $25,000.  The agreement bars either party from appealing the arbitrators' decision, prohibits an award of punitive damages, limits discovery, and provides Respondents the unilateral right to amend the agreement.

On February 21, 2014, while he was still a resident at the facility, Whaley was admitted to Bon Secours St. Francis Hospital, where he died six days later. Arredondo, as Personal Representative of Whaley's estate, brought this action alleging claims for wrongful death and survival against Respondents.  The complaint alleges that during his residency at the facility, Whaley suffered serious physical injuries and died as a result of Respondents' negligence and recklessness.

Respondents moved to compel arbitration.  In opposition to the motion, Arredondo argued (1) the two powers of attorney did not give her the authority to sign the arbitration agreement, and (2) even if she had authority to sign it, the agreement is unconscionable and therefore unenforceable.  To buttress her unconscionability argument, Arredondo submitted an affidavit in which she described the events surrounding her execution of the arbitration agreement. Arredondo stated that when she had questions about the arbitration agreement and told the facility representative she was not comfortable signing it, the facility representative responded, "this [is] a document that everyone sign[s] when admitting their loved ones to the facility and that [Arredondo] needed to sign the 'Arbitration Agreement' in order to ensure [Whaley's] admission to the facility."  Respondents insist the evidence supports only the conclusion that Arredondo's execution of the arbitration agreement was not a prerequisite for Whaley's admission into the facility. As we will discuss, our determination of whether Arredondo was required to sign the agreement in order for Whaley to be admitted is dispositive of the threshold issue of whether Arredondo had authority under the HCPOA to sign the arbitration agreement.

In denying Respondents' motion to compel arbitration, the circuit court ruled neither power of attorney gave Arredondo the authority to sign the arbitration agreement and also ruled that even if Arredondo had authority to sign it, the agreement is unconscionable.  The court of appeals reversed, holding Arredondo had actual authority to execute the arbitration agreement and holding the agreement is not unconscionable.  This Court granted Arredondo's petition for a writ of certiorari to review the court of appeals' decision.

## II. Discussion

"Arbitrability determinations are subject to de novo review." *Johnson v. Heritage Healthcare of Estill, LLC*, 416 S.C. 508, 512, 788 S.E.2d 216, 218 (2016) (quoting *Dean v. Heritage Healthcare of Ridgeway, LLC*, 408 S.C. 371, 379, 759 S.E.2d 727, 731 (2014)). "Nevertheless, a circuit court's factual findings will not be reversed on appeal if any evidence reasonably supports the findings." *Id.* (quoting *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 22, 644 S.E.2d 663, 667 (2007)). "The litigant opposing arbitration bears the burden of demonstrating that he has a valid defense to arbitration." *Id.*

Arredondo argues the court of appeals erred in holding the two powers of attorney granted her authority to sign the arbitration agreement. She also contends the court of appeals erred in holding the arbitration agreement is not unconscionable. We hold neither power of attorney gave Arredondo the authority to execute the arbitration agreement. In light of our holding on that point, we need not address the issue of unconscionability.

### A. Arredondo's Authority to Execute the Arbitration Agreement

"Our courts have looked to contract law when reviewing actions to set aside or interpret a power of attorney." *Stott v. White Oak Manor, Inc.*, 426 S.C. 568, 577, 828 S.E.2d 82, 87 (Ct. App. 2019). "The cardinal rule of contract interpretation is to ascertain and give effect to the intention of the parties, and, in determining that intention, the court looks to the language of the contract." *Id.* (quoting *Watson v. Underwood*, 407 S.C. 443, 454-55, 756 S.E.2d 155, 161 (Ct. App. 2014)). "When the language of a contract is plain and capable of legal construction, that language alone determines the instrument's force and effect." *Id.* (quoting *Watson*, 407 S.C. at 455, 756 S.E.2d at 161). Accordingly, we look to the specific language of the GDPOA and HCPOA to determine whether either document authorized Arredondo to execute a pre-dispute arbitration agreement.

Before we begin our review of the authority granted to Arredondo by the powers of attorney, we emphasize our analysis does not turn upon the presence or absence of an explicit reference to arbitration or arbitration agreements in the powers of attorney. The decision of the United States Supreme Court (USSC) in *Kindred*

*Nursing Centers Ltd. Partnership v. Clark*[1] forecloses such an approach. In *Kindred*, the USSC reviewed two of three consolidated cases from the Supreme Court of Kentucky, one dealing with a power of attorney signed by Wellner and another signed by Clark.[2] In both cases, the agents holding the powers of attorney signed arbitration agreements when their principals were admitted into a nursing facility. The Supreme Court of Kentucky held an agent was authorized to sign an arbitration agreement depriving her principal of "an 'adjudication by judge or jury' only if the power attorney 'expressly so provide[d].'" 137 S. Ct. at 1426 (quoting *Whisman*, 478 S.W.3d at 329). The USSC dubbed this approach the "clear-statement rule" and held it violated the Federal Arbitration Act (FAA) by "fail[ing] to put arbitration agreements on an equal plane with other contracts." *Id.* at 1426-27. The USSC then held the Clark power of attorney undoubtedly authorized the agent to sign an arbitration agreement because it granted the agent the all-encompassing authority "to transact, handle, and dispose of all matters affecting me and/or my estate in any possible way" and "[g]enerally to do and perform for me and in my name all that I might do if present." *Id.* at 1425; *see Whisman*, 478 S.W.3d at 317-18. As such, no remand for further proceedings related to the Clark power of attorney was necessary. However, the USSC noted the Supreme Court of Kentucky had invalidated the Wellner arbitration agreement on two alternative grounds, one based upon the prohibited clear-statement rule and the other based upon the Kentucky Court's finding that the Wellner power of attorney was not otherwise broad enough to allow Wellner's agent to sign a pre-dispute arbitration agreement. Noting these alternative holdings, the USSC remanded the Wellner case to the Supreme Court of Kentucky for an analysis of whether the alternative holding was tainted by or not wholly independent of the clear-statement rule. We discuss below the Supreme Court of Kentucky's decision on remand.

### 1. The General Durable Power of Attorney

Paragraph one of the General Durable Power of Attorney (GDPOA) authorized Arredondo:

---

[1] 137 S. Ct. 1421 (2017).

[2] *Extendicare Homes, Inc. v. Whisman*, 478 S.W.3d 306 (Ky. 2015). Belinda Whisman, the agent under a power of attorney executed by her father, was the lead respondent in the three cases before the Supreme Court of Kentucky. However, only the Wellner and Clark powers of attorney were before the USSC in *Kindred*.

To make, sign, execute, issue, assign, transfer, endorse, release, satisfy and deliver any and all instruments or writing of every kind and description whatsoever, whether sealed or unsealed, of, in or concerning any or all of my business affairs, property or other assets whatsoever, including all property, real, personal or mixed, stocks, securities and choses in action, and wheresoever situated, including, without limiting the generality hereof thereto, notes, bonds, mortgages, leases, deeds, conveyances, bills of sale, and assignments, endorsements, releases, satisfactions, pledges or any agreements concerning any transfers of the above or of any other property, right or thing.

**(a) Chose in action**

The court of appeals held the GDPOA granted Arredondo authority to execute the arbitration agreement because it "granted Arredondo authority to execute all instruments concerning all types of property, including 'choses in action.'" Further, the court of appeals held Arredondo's authority under the GDPOA "extended to 'any other property, right or thing.'" Arredondo first takes issue with what she claims was the court of appeals' overly broad interpretation of the term "choses in action." She contends the court of appeals erroneously elevated a chose in action to include a cause of action that did not exist at the time Arredondo signed the arbitration agreement. In light of the language used in the GDPOA, we agree with Arredondo.

A "chose in action" is a type of property interest or a proprietary right to a claim or debt. *See Ball v. Ball*, 312 S.C. 31, 33-34, 430 S.E.2d 533, 534-35 (Ct. App. 1993) (holding a vested military pension was a "chose in action," or form of property, because the recipient "could maintain an action at law to enforce this right should the military ever wrongfully attempt to deny it to him"), *aff'd*, 314 S.C. 445, 445 S.E.2d 449 (1994); *see also Chose in Action*, *Black's Law Dictionary* (11th ed. 2019) (defining "chose in action" as "a proprietary right in personam, such as a debt owed by another person, a share in a joint-stock company, or *a claim for damages in tort*" (emphasis added)). Arredondo and Respondents agree "chose in action" generally means "cause of action."

Respondents contend the court of appeals correctly held the GDPOA authorized Arredondo to sign the arbitration agreement because the agreement concerned a cause of action against the facility. Again, Arredondo argues this interpretation fails because Whaley did not possess a cause of action against

Respondents at the time the arbitration agreement was signed. Respondents cite *Ball* for the proposition that "South Carolina courts construe the term 'property' very broadly." 312 S.C. at 33, 430 S.E.2d at 534. We agree with that basic proposition, but it does not necessarily mean the GDPOA applied to a property right that did not exist at the time Arredondo signed the arbitration agreement. We return to *Kindred* and the Supreme Court of Kentucky's decision on remand to explain.

As noted above, in *Kindred*, the USSC remanded the case of the Wellner power of attorney with instructions to the Supreme Court of Kentucky to determine whether its application of the prohibited "clear-statement rule" impermissibly tainted its alternative holding that the Wellner power of attorney otherwise did not authorize Wellner's agent to sign a pre-dispute arbitration agreement. 137 S. Ct. at 1429. The Supreme Court of Kentucky considered the remanded issue in *Kindred Nursing Centers Ltd. Partnership v. Wellner*, 533 S.W.3d 189 (Ky. 2017). One provision of the Wellner power of attorney authorized Wellner's agent "to make, execute and deliver deeds, releases, conveyances and contracts of every nature in relation to both real and personal property, including stocks, bonds, and insurance." *Wellner*, 533 S.W.3d at 193 (quoting *Whisman*, 478 S.W.3d at 325). Similar to Respondents' position in the instant case, the nursing facility seeking to enforce the arbitration agreement in *Wellner* claimed the term "personal property" included choses in action such as personal injury claims. *Id.* at 192-93. While the Supreme Court of Kentucky recognized "a personal injury claim is a chose-in-action, and therefore constitutes personal property," it nevertheless held—independently of the clear-statement rule—the "pre-dispute arbitration contract did not relate to any property rights of . . . Wellner." *Id.* at 194 ("By executing [the nursing home's] pre-dispute arbitration agreement, [Wellner's agent] did not 'make, execute and deliver deeds, releases, conveyances and contracts of [any] nature in relation to [Wellner's] property.' The only 'thing' of . . . Wellner's affected by the pre-dispute arbitration agreement was his constitutional rights, which no one contends to be his real or personal property." (quoting *Whisman*, 478 S.W.3d at 325-26)).

We agree with the rationale of the Supreme Court of Kentucky.[3] We hold this particular GDPOA did not authorize Arredondo to sign the arbitration agreement because the arbitration agreement did not concern a chose in action or any other property right Whaley possessed at the time Arredondo signed it.

---

[3] The USSC denied the nursing facility's subsequent petition for a writ of certiorari. *Kindred Nursing Ctrs. Ltd. P'ship v. Wellner*, 139 S. Ct. 319 (2018).

### (b) "Transfer" of property, right, or thing

We also hold the court of appeals erred in concluding Arredondo's authority under the GDPOA "extended to 'any other property, right or thing.'"  The court of appeals took this phrase out of context, as the complete provision including this phrase authorized Arredondo to execute "any agreements concerning any <u>transfers</u> of the above or <u>of</u> any other property, right or thing."  (emphases added).  The GDPOA does not define "transfers."  "Where a contract is unambiguous, clear and explicit, it must be construed according to the terms which the parties have used, to be taken and understood in their plain, ordinary, and popular sense."  *Warner v. Weader*, 280 S.C. 81, 83, 311 S.E.2d 78, 79 (1983).  The plain, ordinary, and popular meaning of the noun "transfer" is a "conveyance of right, title, or interest in real or personal property from one person to another."  *Transfer*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/transfer (last visited Mar. 4, 2021).  By signing the arbitration agreement, Arredondo (for herself, for Whaley, and for his heirs and executors) waived the right to a jury trial, waived any claim to punitive damages, agreed to limited discovery, and waived the right to appeal the arbitration decision.  These acts were not "transfers" of anything to anyone.  Thus, the provision of the GDPOA authorizing Arredondo to enter into any agreements concerning transfers of any property, right, or thing did not grant her the authority to sign the arbitration agreement.

### (c) Title of GDPOA

Finally, Respondents argue the power of attorney's title—"General Durable Power of Attorney"—suggests Whaley intended for the instrument to grant Arredondo broad authority.  Rather than relying on such a generalization, we look to the actual language of the GDPOA to determine what authority it granted Arredondo.  While the GDPOA gave Arredondo significant authority to make business and property decisions for Whaley, the mere title of the document did not increase Arredondo's authority beyond the plain meaning of the provisions contained in the document.  Certainly, the GDPOA could have been drafted to give Arredondo the broad power to sign all documents Whaley could sign himself or otherwise do anything Whaley could do himself, but it was not so drafted.  *Cf. Kindred*, 137 S. Ct. at 1429 (explaining the Clark power of attorney, which provided the agent power "to transact, handle, and dispose of all matters affecting me and/or my estate in any possible way," and "generally to do and perform for me and in my name all that I might do if present," was broad enough to authorize the execution of a pre-dispute arbitration agreement).

For the foregoing reasons, we hold the court of appeals erred in concluding the GDPOA granted Arredondo authority to execute the arbitration agreement.

## 2. The Health Care Power of Attorney

When Whaley was admitted to the facility, Arredondo also held a Health Care Power of Attorney (HCPOA) naming her as Whaley's attorney-in-fact. In their arguments regarding Arredondo's authority under this instrument, the parties focus solely upon the provisions of subparagraph 11(d) in the "Agent's Powers" section of the HCPOA. Subparagraph 11(d) authorized Arredondo:

> To take any other action necessary to making, documenting, and assuring implementation of decisions concerning my health care, including, but not limited to, granting any waiver or release from liability required by any hospital, physician, nursing care provider, or other health care provider; signing any documents relating to refusals of treatment or the leaving of a facility against medical advice, and pursuing any legal action in my name, and at the expense of my estate to force compliance with my wishes as determined by my agent, or to seek actual or punitive damages for the failure to comply.

### (a) Action "necessary" to making, documenting, or implementing a health care decision

The court of appeals held the HCPOA granted Arredondo the authority to sign the arbitration agreement because it authorized her "to pursue legal action and to grant any waiver required by health care providers such as [Respondents]." We will discuss that holding in a moment, but we initially address the first clause of subparagraph 11(d). Arredondo clearly had no authority to take any action under the first clause of subparagraph 11(d) unless the action taken was "<u>necessary</u> to making, documenting, and assuring implementation" of a decision concerning Whaley's health care. (emphasis added). The only health care decision in play when Arredondo signed the arbitration agreement was Arredondo's decision to seek Whaley's admission into the facility. Consequently, we must determine whether signing the arbitration agreement was "necessary" to Arredondo making, documenting, and assuring implementation of that decision.

The plain, ordinary, and popular meaning of the word "necessary" is "absolutely needed" or "required." *Necessary*, Merriam-Webster Dictionary, https://

www.merriam-webster.com/dictionary/necessary (last visited Mar. 4, 2021). We hold Arredondo's signature on the arbitration agreement was not "absolutely needed" or "required" to ensure Whaley's admission into the facility. In support of her argument on the separate issue of whether the arbitration agreement is unconscionable, Arredondo submitted her affidavit in which she testified a facility representative told her she had to sign the agreement in order for Whaley to be admitted. On the issue of unconscionability, Respondents have consistently maintained Arredondo was not required to sign the arbitration agreement. During its discussion of the issue of unconscionability, the circuit court found, "[Arredondo] was only told [the arbitration agreement] <u>must</u> be signed to ensure [Whaley's] admission to the facility." (emphasis added by the circuit court). These arguments relative to unconscionability cut against the parties' respective interests on the threshold issue of Arredondo's authority under the HCPOA. Nevertheless, we must determine the propriety of this factual finding of the circuit court by examining the evidence in the record. *See Johnson*, 416 S.C. at 512, 788 S.E.2d at 218 ("[A] circuit court's factual findings will not be reversed on appeal if any evidence reasonably supports the findings." (citation omitted)). We hold the evidence in the record reasonably supports only the finding urged by Respondents—the arbitration agreement was presented to Arredondo as a "voluntary standalone" agreement that was not a prerequisite for Whaley's admission into the facility. Arredondo plainly stated in her affidavit that Whaley had already been admitted into the facility and provided with a room before Arredondo was asked to sign the arbitration agreement. Similarly, in their brief to this Court, Respondents state: "[The facility] did not present the Agreement until after Arredondo received the services she requested." As Respondents stressed during oral argument before this Court, once Whaley was admitted to the facility, he was entitled to statutory protections, and the facility could not have discharged him had Arredondo refused to sign the arbitration agreement. *See* S.C. Code Ann. § 44-81-40(D) (2018) ("A resident may be transferred or discharged only for medical reasons, for the welfare of the resident or for the welfare of other residents of the facility, or for nonpayment and must be given written notice of not less than thirty days . . . .").

As courts in other jurisdictions have recognized, the characterization of an arbitration agreement as either a mandatory condition to admission or an optional, collateral agreement often determines the authority issue when the agent holds a power of attorney empowering her to make necessary health care decisions. *Compare LP Louisville E., LLC v. Patton*, 605 S.W.3d 300, 311 (Ky. 2020) ("[W]hen an agreement to arbitrate is presented as a condition of admission to a

nursing home, unless otherwise agreed, a power of attorney expressing general authority to make necessary health care decisions includes the incidental or reasonably necessary authority to enter that agreement."), *with Dickerson v. Longoria*, 995 A.2d 721, 739 (Md. 2010) (explaining an agent authorized to make health care decisions on his principal's behalf did not have authority to execute a voluntary arbitration agreement because "[t]he decision to sign a free-standing arbitration agreement is not a health care decision if the patient may receive health care without signing the arbitration agreement"), *Life Care Ctrs. of Am. v. Smith*, 681 S.E.2d 182, 185-86 (Ga. Ct. App. 2009) (explaining health care power of attorney did not authorize daughter to execute "optional" arbitration agreement on mother's behalf when daughter was authorized "to make any decision [the mother] could make to obtain or terminate any type of health care"), *Miss. Care Ctr. of Greenville, LLC v. Hinyub*, 975 So. 2d 211, 218 (Miss. 2008) (explaining health care surrogate did not have authority to execute arbitration agreement on her father's behalf because the execution of an arbitration agreement is not a health care decision when the arbitration agreement is not required for admission into the nursing home), *Coleman v. United Health Servs. of Ga., Inc.*, 812 S.E.2d 24, 26 (Ga. Ct. App. 2018) (explaining agent authorized to take action necessary to admit principal to health care facility did not have authority to execute "voluntary" arbitration agreement), *Wisler v. Manor Care of Lancaster PA, LLC*, 124 A.3d 317, 324 (Pa. Super. Ct. 2015) (stating an agent's authority to consent to medical treatment on behalf of a principal "does not necessarily entail the authority to consent to arbitration, agreement to which was not a precondition to be admitted to [the facility]"), *and Miller v. Life Care Ctrs. of Am., Inc.*, 478 P.3d 164, 172-74 (Wyo. 2020) (explaining durable health care power of attorney did not give agent authority to execute arbitration agreement because arbitration agreement was not required for admission to health care facility and, therefore, was unrelated to principal's health care).

### (b) Authority to grant any waiver <u>required</u> by a health care provider

We now return to the court of appeals' holding that subparagraph 11(d) of the HCPOA granted Arredondo the authority to sign the arbitration agreement because the HCPOA authorized her "to pursue legal action and to grant any waiver required by health care providers such as [Respondents]." Addressing the second part of this holding first, we note subparagraph 11(d) gave Arredondo the authority to sign only those waivers "<u>required</u> by [a] . . . health care provider." (emphasis added). As Respondents contend, the arbitration agreement includes a series of waivers (of the right to adjudication by a judge or jury, of the right to an award of punitive damages,

and of the right to an appeal). As we have already discussed, Arredondo was not required to sign the arbitration agreement for Whaley to be admitted. Since Arredondo was not required to sign the arbitration agreement, it logically follows that any waivers contained in the agreement were not required by the facility. For the reasons set forth above in our discussion of the term "necessary," we conclude the HCPOA did not give Arredondo the authority to grant the waivers recited in the arbitration agreement.

### (c) Authority to pursue legal action

The court of appeals also held the provision in subparagraph 11(d) of the HCPOA authorizing Arredondo to "pursu[e] any legal action in [Whaley's] name" granted her the authority to sign the arbitration agreement. Arredondo claims that because she signed the arbitration agreement before any potential legal claim accrued, this provision did not grant her authority to sign the agreement. Respondents argue this language of the HCPOA did not limit Arredondo's authority to taking action only after a cause of action accrues. Respondents contend Arredondo's authority to pursue legal action included selecting arbitration as a preferred forum for dispute resolution.

We first note the parties overlook the context in which this provision appears in subparagraph 11(d) of the HCPOA. This provision authorized Arredondo to pursue legal action only to "force compliance with [Whaley's] wishes as determined by [Whaley's] agent, or to seek actual or punitive damages for the failure to comply." For that reason alone, we hold this provision of the HCPOA is of no significance in this case. However, even if this provision authorized Arredondo to pursue legal action unrelated to forcing compliance with Whaley's health care wishes, this provision still did not authorize Arredondo to sign a pre-dispute arbitration agreement. In *Wellner*, the Supreme Court of Kentucky analyzed a provision of the Wellner power of attorney authorizing the agent to "demand, sue for, collect, recover and receive all . . . demands whatsoever," and to "institute legal proceedings." 533 S.W.3d at 193-94. The Court recognized "the power to institute or defend suits concerning [Wellner's] property rights would necessarily encompass the power to make litigation-related decisions within the context of a suit so instituted, *including the decision to submit the pending dispute to mediation or arbitration*." *Id.* at 193 (quoting *Whisman*, 478 S.W.3d at 323) (internal quotation marks omitted). Yet, the Court held the provision did not grant the agent authority to execute a pre-dispute arbitration agreement: "the act of executing a pre-dispute arbitration agreement upon admission to a nursing home ha[s] nothing at all to do with . . . institut[ing] legal

proceedings." *Id.* at 193-94 (quoting *Whisman*, 478 S.W.3d at 325) (internal quotation marks omitted) (second alteration in original). Here, Arredondo did not execute the arbitration agreement in connection with an existing claim Whaley had against the facility. We again agree with the Supreme Court of Kentucky's reasoning and conclude Arredondo's execution of the pre-dispute arbitration agreement did not constitute the pursuit of legal action.

We hold the court of appeals erred in holding the HCPOA granted Arredondo authority to execute the arbitration agreement.

### III. Conclusion

Under the facts of this case, neither the GDPOA nor the HCPOA granted Arredondo authority to execute the arbitration agreement. Therefore, we reverse the court of appeals and hold the arbitration agreement is unenforceable. We need not address Arredondo's argument that the arbitration agreement is unconscionable. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing that an appellate court need not address remaining issues when resolution of a prior issue is dispositive).


**REVERSED.**

**BEATTY, C.J., KITTREDGE and HEARN, JJ., concur. FEW, J., concurring in a separate opinion.**

**JUSTICE FEW:** I concur in the majority opinion. I write only to address Respondents' and the court of appeals' reliance on the obsolete phrase "chose in action." The majority takes two steps regarding Respondents' argument as to the meaning of the phrase "chose in action." The majority's first step is to hold that the phrase does not mean what Respondents claim it means. I completely agree with the majority. The second step is unnecessarily to define the phrase. In doing so, the majority brings a new and undeserved life to a phrase that—in my opinion—has no precise meaning in modern law. It is time for attorneys and courts to stop using such antiquated phrases, not to resuscitate them.

Historically, a "chose" was a "thing," as in a physical thing. *See* William C. Anderson, A DICTIONARY OF LAW 179 (1891) (defining "CHOSE" as "A thing recoverable by an action at law: a thing, personalty"); 1 Alexander M. Burrill, A LAW DICTIONARY AND GLOSSARY 288 (1869) (defining "CHOSE" as "A thing"). A "chose in action" was the legal right to bring an action in court to recover the thing, "A thing of which one has not the possession or actual enjoyment, but only a right to it, or a right to demand it by action at law." Burrill, *supra*, at 288. Even in the nineteenth century, however, the phrase had no precise definition, and the general definition changed over time according to usage. *See, e.g.*, William R. Anson, PRINCIPLES OF THE LAW OF CONTRACT 362 n.(b) (1919) ("The term *chose in action* has been in common use for a long time, but some doubts have been recently raised as to its precise meaning." (citing *Law Quarterly Review for 1983, 1894, 1895*)). In one lengthy attempt at explaining the meaning of the phrase, two authors wrote, "Originally the term was only applied to a right of action in the strict sense, that is, the right to bring an action at law, but subsequently it was extended to the right of taking proceedings in equity." 1 Stewart Rapalje and Robert L. Lawrence, A DICTIONARY OF AMERICAN AND ENGLISH LAW 207 (1883); *see also id.* ("A right of presentation to a benefice when the church is vacant is called in the old books a chose in action; but this use of the word is obsolete.") (citation omitted). Other early commentators described varying limits for the use of the phrase. *See, e.g.*, Percy Bordwell, *Seisin and Disseisin (Concluded) v. Chattels*, 34 Harv. L. Rev. 717, 722-23 (1921) (stating "it is hard to include a right to a chattel in the adverse possession of another as a chose in possession, just as it is hard to include under choses in action such incorporeal rights as patents, copyrights, and trade names which have none of the ephemeral characteristics of rights of action"); Thaddeus D. Kenneson, *Purchase for Value Without Notice*, 23 Yale L.J. 193, 194 (1914) (stating "a chose in action always presupposes a personal relation between two individuals").

In South Carolina, a "chose in action" included a right to property in the form of "notes or bonds," such as those "taken by an administrator at a sale of his intestate's estate." *Rhame v. Lewis*, 34 S.C. Eq. 269, 303 (13 Rich Eq. 93, 105) (Ct. App. 1867) (citing *Thackum v. Longworth*, 11 S.C. Eq. 267, 274 (2 Hill Eq. 132, 134) (Ct. App. L. & Eq. 1835)). Still, the phrase was used to describe "a thing" in the sense of an existing right in property that is not in the owner's current possession. The phrase is used in one subsection of our Rules of Civil Procedure, Rule 17(e), and in several current sections of the South Carolina Code, each retaining the link between the phrase and "property." *See, e.g.*, S.C. Code Ann. § 12-6-30(11) (2014) (defining "Tangible property" in the Income Tax Act to exclude "choses in action"); S.C. Code Ann. § 12-16-20(4) (2014) (defining "Intangible personal property" in the Estate Tax Act to include "choses in action"); S.C. Code Ann. § 16-23-710(17) (2015) ("'Property' . . . includ[es] . . . choses in action, and other similar interest in property."); S.C. Code Ann. § 33-36-840(2) (2006) (providing after merger of not-for-profit corporations, "The new or surviving corporation . . . possesses . . . all property, real and personal, applications for membership, all debts due on whatever account, and all other choses in action of each of the consolidating or merging corporations."); S.C. Code Ann. § 40-39-10(3) (Supp. 2020) (defining "Pledged goods" as to "Pawnbrokers" as "tangible personal property . . . , choses in action, . . . , which property is deposited with or otherwise actually delivered into the possession of a pawnbroker in the course of his business").

In the 1979 edition of BLACK'S LAW DICTIONARY, "Chose" still meant, "A thing; an article of personal property," *Chose*, BLACK'S LAW DICTIONARY (5th ed. 1979), and "Chose in action" still meant, "Right of proceeding in a court of law to procure payment of sum of money, or right to recover a personal chattel or a sum of money by action," *Chose in action*, BLACK'S LAW DICTIONARY (5th ed. 1979). Eventually, as usage changed, courts and commentators have expanded the definition. *See, e.g.*, *Narruhn v. Alea London Ltd.*, 404 S.C. 337, 344 n.3, 745 S.E.2d 90, 93 n.3 (2013) ("A 'chose in action' has been variously defined . . . ."); Anson, *supra*, at 362 n.1 ("The term '*chose* in action' may have once meant the physical *thing* to be recovered; but it now means an aggregate of legal relations that include one or more rights *in personam*. It does not include patents or copyrights, for in these rights are *in rem*."); *chose in action*, BLACK'S LAW DICTIONARY (11th ed. 2019) (stating the phrase includes "A proprietary right in personam, such as . . . a claim for damages in tort").

If there was a time in our history when the phrase conveyed a precise meaning, the phrase has lost that meaning as the passage of time brought new usages. What is left of "chose in action" is a descriptive phrase with no precise meaning, a phrase we should stop using because it is not only vague and meaningless but also obsolete. Today, if lawyers wish to write legal instruments such as powers of attorney with precise meaning, they should use phrases that in current usage are defined precisely, and they should avoid phrases like "chose in action" that mean nothing.

As the majority explains, the Supreme Court of the United States reversed the Kentucky Supreme Court's interpretation of a power of attorney regarding arbitration because the "clear statement rule" the Kentucky court's interpretation created "fails to put arbitration agreements on an equal plane with other contracts." *Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1427, 197 L. Ed. 2d 806, 812 (2017). Our Court, therefore, may not find a power of attorney inadequate to grant the authority to agree to arbitration based on what the document *does not say* about arbitration. In this case, our Court must examine what the General Durable Power of Attorney *does say* about Ms. Arredondo's authority to bind her father. Respondents rely on what they claim is clarity in the phrase "choses in action." In using the phrase "chose in action," however, the General Durable Power of Attorney does not grant any authority because the phrase does not mean anything. The majority's first step ends the analysis because the phrase "choses in action" does not say a thing about Ms. Arredondo's authority to bind her father to an arbitration provision.